PHOENIX ENGINEERING, INC., Tennessee Roofing Corporation, Del–Air Service Company, Inc., Lloyd J. Bunch, J.C. Bible, East Tennessee Chapter Associated Builders and Contractors, Inc., Associated General Contractors of Tennessee, Inc., Knoxville Branch, Plaintiffs–Appellants,

v.

MK–FERGUSON OF OAK RIDGE COMPANY, Knoxville Building and Construction Trades Council, AFL–CIO, United States of America, James D. Watkins, Joseph LaGrone, Defendants–Appellees.

Nos. 91–5527, 91–6358.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 15, 1991.

Submitted Dec. 19, 1991.

Decided June 11, 1992.

Rehearing En Banc Denied July 27, 1992.

R. Loy Waldrop, Jr. (briefed), David N. Garst, Alan M. Parker, Lewis, King, Krieg & Waldrop, Knoxville, Tenn., Maurice Baskin (argued and briefed), Venable, Baetjer, Howard & Civiletti, Washington, D.C., for plaintiffs-appellants.

E.H. Rayson (briefed), Kramer, Rayson, McVeigh, Leake & Rodgers, Knoxville, Tenn., James Kelley (argued and briefed), Edward C. Uehlein, Morgan, Lewis & Bockius, Richard M. Resnick (briefed), Lawrence Cohen, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, D.C., S. Del Fuston (briefed), Chattanooga, Tenn., Jerry G. Cunningham, U.S. Atty., Office of the U.S. Atty., Knoxville, Tenn., D. Scott Barash (briefed), U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.

Before: KEITH and RYAN, Circuit Judges; and TIMBERS, Senior Circuit Judge.*

RYAN, Circuit Judge.

At issue in this case is the legality of a Project Labor Agreement entered into by the defendants MK–Ferguson of Oak Ridge Corporation and the Knoxville Building and Construction Trades Council. Plaintiffs appeal from an order of the district court denying their motion for a preliminary injunction and from a series of orders of the district court dismissing the plaintiffs' complaint against the defendants.

Plaintiffs raise the following issues on appeal: 1) whether the enforcement of the Project Labor Agreement constitutes governmental interference with private collective bargaining in violation of the National Labor Relations Act, 29 U.S.C. § 158; and 2) whether the enforcement of the Project Labor Agreement violates the Competition in Contracting Act, 41 U.S.C. § 253, and the related Federal Acquisition Regulation, 48 C.F.R. § 52.244–5?

We conclude that the Project Labor Agreement violates neither the NLRA nor the Competition in Contracting Act. We thus affirm the district court's dismissal of the case, and consequently do not reach the plaintiffs' challenge to the denial of a preliminary injunction.

---

\* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

I.

The case involves three groups of plaintiffs: the corporate or contractor plaintiffs are Phoenix Engineering, Inc., Tennessee Roofing Corporation, and Del–Air Service Company, Inc.; the individual plaintiffs are Lloyd Bunch and J.C. Bible; and the association plaintiffs are the East Tennessee Chapter Associated Builders and Contractors and the Associated General Contractors of Tennessee, Inc. The defendants are the general contractor MK–Ferguson of Oak Ridge Corporation, the federal defendants,[1] and the Knoxville Building and Construction Trades Council, AFL–CIO.

The Department of Energy (DOE) maintains a nuclear facility at Oak Ridge, Tennessee, known as Oak Ridge Operations (ORO). The DOE retains outside contractors to operate and manage different aspects of the facility. Prior to 1989, construction at ORO was directed by three entities: the DOE itself, the overall facility manager (Martin Marietta), and the construction contractor (Rust Engineering). In 1989, the DOE decided to consolidate the functions of outside contractors and retain one construction contractor for all construction. In April 1990, the DOE chose MK–Ferguson of Oak Ridge Corporation (MK–F) to succeed Rust Engineering. MK–F took over the operation on October 1, 1990, when the Management and Operating (M & O) contract it entered into with the DOE took effect.

In May 1990, prior to DOE's contract with MK–F taking effect, there was a labor strike at ORO when the existing Rust Labor Agreement expired. MK–F, knowing it would soon assume responsibility for construction at ORO, stepped in and negotiated with the Building Trades Council, an umbrella organization representing sixteen different craft unions. By August, MK–F and the Building Trades Council agreed on a preliminary version of the Project Labor Agreement, a type of labor agreement

---

1. The federal defendants are the United States, James D. Watkins, the Secretary of Energy, and Joseph LaGrone, the Manager of the Department of Energy's Oak Ridge Operations.

known as a prehire agreement. One major difference between this new agreement and the Rust Labor Agreement was that under the Rust agreement, nonunion signatory subcontractors were not required to adopt the full agreement, only the work rules. Under the new Project Labor Agreement, nonunion contractors had to adopt the whole agreement, including the employee referral provisions.

In August 1990, several contractors, including the plaintiffs, protested some of the provisions. In September, MK–F and the Building Trades Council modified the provisions relating to the job referral procedures, incorporating a core employee provision. The final version went into effect on October 1. Under the final version, the Project Labor Agreement requires that "[a]ny subcontractor, of whatever tier, performing covered work on this project site, shall become a signatory to this Project Agreement." The Agreement also requires employers to "recognize[ ] the signatory unions as the collective bargaining agents for its employees."

The key provision of the final Agreement was the hiring hall procedure for the referral of employees. Under the Agreement, when the subcontracting construction companies need craft employees, "the Employer shall notify the Unions as to the number and classification of employees required. It shall be the responsibility of the Unions to supply the necessary numbers in accordance with hiring hall procedure." Once tradesmen are referred by the Union, the employer "shall have the right to determine the competency of all employees ... [and also] the right to reject any applicant referred by the Unions." The employer must use the hiring hall for all employees except that "[e]ach employer will be allowed to have designated and referred for employment up to four (4) of their supervisory, regular, essential or key employees (hereinafter known as 'core' employees)." While the referred employees themselves need not be union, the Unions will control the referral through the hiring halls.

In October 1990, MK–F solicited bids from subcontractors pursuant to the new M & O contract. At the time, MK–F utilized the Rust Subcontract Document Package, which explained various details of the relationship between prime contractor and the subcontractor. Both the bid solicitation itself and the document package contained several provisions relating to DOE involvement. In November 1990, MK–F revised its Subcontract Document Package and deleted any references to the DOE.

In December 1990, plaintiffs filed a complaint seeking declaratory and injunctive relief against defendants. The complaint contained five counts: 1) labor law preemption claim and related constitutional claims of contractor plaintiffs; 2) labor law preemption claim and related constitutional claims of individual plaintiffs; 3) Competition in Contracting Act (CICA) and Federal Acquisition Regulation (FAR) claims; 4) antitrust claims; and 5) a specific labor law claim regarding the "hot cargo" prohibition in the NLRA, 29 U.S.C. § 158(e). The complaint sought an injunction to restrain the defendants from enforcing the Project Labor Agreement, a declaration that the Agreement violates federal law, and an award of monetary damages.

In January 1991, plaintiffs moved for a preliminary injunction to prevent enforcement of the Project Labor Agreement and to prevent MK–F from letting any subcontracts pursuant to the Agreement. All defendants opposed the request and the DOE also moved to dismiss, or alternatively, for summary judgment. On March 22, 1991, the district court denied the plaintiffs' motion for a preliminary injunction. Plaintiffs filed a timely notice of appeal in April.

On April 29, the district court granted in part and denied in part the federal defendants' motion to dismiss. The district court dismissed most claims, including the NLRA claim, but refused to dismiss and denied summary judgment as to the CICA–FAR claim.

On April 24, the Building Trades Council moved for summary judgment on all counts. MK–F did the same on May 8. On June 20, the district court granted the Building Trades Council's motion for summary judgment on all claims, including the

CICA–FAR claim. The court granted summary judgment to MK–F on all but the CICA–FAR claim.

Immediately prior to oral argument in this court in the appeal from the denial of a preliminary injunction, the district court granted final judgment to the defendants contemporaneous with its entry of an order granting the remainder of the federal defendants' and MK–F's motions to dismiss. In this order, the district court dismissed the remaining claim, that is, the CICA–FAR claim, against the federal defendants and MK–F.

On November 5, this court heard oral argument in the appeal of the denial of the preliminary injunction. At that time, all parties expressed a desire to consolidate the pending appeal with the upcoming appeal from the dismissal of the complaint. On November 6, plaintiffs filed a timely notice of appeal from the orders which granted final judgment to defendants. On November 11, plaintiffs filed a motion to consolidate the appeal from the district court's denial of the preliminary injunction with the appeal from the final judgment, and on December 9, this court granted the plaintiffs' motion to consolidate appeals.

## II.

### Disposition of Underlying Case

#### A.

### Standard of Review

The resolution of the underlying case requires us to review the district court's grant of a motion to dismiss under Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. This court reviews a grant of a motion to dismiss under the *de novo* standard: "Whether the district court properly dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is a question of law subject to *de novo* review. All factual allegations are deemed admitted, and when an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039–40 (6th Cir.1991) (citations omitted).

We note that the district court did not address the various motions exactly as presented by the parties. While the federal defendants' motions included a motion to dismiss, neither the Building Trades Council nor MK–F ever moved to dismiss, moving instead for summary judgment. Nevertheless, the district court disposed of the two contested issues—the NLRA claim and the CICA–FAR claim—under Rule 12(b)(6) as to all defendants. Therefore, this court will review the district court's various orders accordingly.[2]

#### B.

### NLRA Claim

■ Although the plaintiffs originally based their complaint on several grounds, on appeal they pursue only the NLRA issue and the CICA–FAR issue. As to the NLRA issue, plaintiffs generally contend that the preemption doctrine established by the Supreme Court in *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), prevents the enforcement of the Project Labor Agreement.

The NLRA issue involves two questions:

1. Whether the DOE is the real contracting party in this case?

---

2. The Building Trades Council and MK–F moved for summary judgment on all claims. The district court granted summary judgment to the Building Trades Council and MK–F on all claims against them, with the exception of the CICA–FAR claim against MK–F. Order, 6/20/91, at 4. Nevertheless, in granting summary judgment, the district court expressly noted that it was relying on its earlier order granting the federal defendants' motion to dismiss. In that order, the district court dismissed (as opposed to granting summary judgment on) all claims against the DOE, including the NLRA claim, except for the CICA–FAR claim. Order, 4/29/91, at 8. The district court later disposed of the CICA–FAR claims against the DOE and MK–F in a single order. The district court dismissed, pursuant to Fed.R.Civ.P. 12(b)(6), the CICA–FAR claim of the plaintiffs. Order, 10/28/91, at 6. As to the CICA–FAR claim specifically against MK–F, the district court apparently treated MK–F's summary judgment motion as a motion to dismiss.

2. Whether *Machinists* preemption operates to prohibit interference by governmental actors in the negotiation of a prehire agreement?

### 1.

### District Court Opinions

The district court addressed the NLRA issue in three different orders. The court extensively discussed the issue in its March 22 order denying the plaintiffs' motion for a preliminary injunction. The district court also considered the issue in its April 29 order dismissing the NLRA claim against the DOE, and in its June 20 order granting summary judgment to the Building Trades Council and MK–F on the NLRA claim.

The heart of the district court's reasoning on the NLRA issue lies in its March 22 and April 29 orders.[3] Therefore, although we do not review the district court's decision on the preliminary injunction, as noted below in Part III of this opinion, we will analyze the reasoning contained in the March 22 order as it applies to the NLRA issue.

In its April 29 order, the district court initially noted:

For purposes of the pending motion, the Court is prepared to accept that there is an agency relationship between the government defendants and MK–F; that the government was involved, through its agent, in negotiating the Project Labor Agreement; and that one effect of the agreement is to increase the estimated cost of construction to non-union contractors who bid for government con-

tracts, depriving them of a significant competitive edge they previously had over unionized construction contractors.

Order, 4/29/91, at 5. The court also referenced its earlier findings, noting: "As indicated in this Court's Order of March 22, 1991, the Court recognizes that the Project Labor Agreement works to the financial disadvantage of the plaintiffs." *Id.* at 6.[4]

The district court then held on the NLRA claim:

The Court understands the plaintiff's contention that under federal labor law, the collective bargaining process must be free to occur without any form of governmental interference or control. But surely this protection does not apply when one of the parties to the bargaining process is the government itself or someone acting as its agent. The Court is satisfied that the plaintiffs have failed to state any claim against the federal defendants under federal labor law.

*Id.* at 6. This holding dismissing the NLRA claim reflects the reasoning the district court had earlier employed, in its March 22 order, when it denied the plaintiffs' motion for a preliminary injunction.

In the March 22 order, the district court addressed the legal implications of the NLRA claim more extensively. While the district court made two factual findings, *see supra* note 4, the court did not base its decision to deny the preliminary injunction these findings. Instead, the court identified two threshold issues of law. The first was "whether there is any law that limits

---

3. In its April 29 order, the district court addressed the DOE's motion to dismiss all claims, including the NLRA claim. The district court granted the motion, except as to the CICA–FAR claim. In its June 20 order, the district court addressed the summary judgment motions of the Building Trades Council and MK–F. The court simply noted:

In an order of April 29, 1991, this Court dismissed all the claims against the federal defendants except those involving [CICA and FAR].

For the same reasons expressed in that Order, the Court hereby dismisses all claims against the private defendants that involve violations of the National Labor Relations Act or raise a constitutional claim.

Order, 6/20/91, at 2–3.

4. In the March 22 order, the district court explained the effect of the Project Labor Agreement on the plaintiffs. First, it concluded that "[t]here is no question that the Project Labor Agreement works to the financial disadvantage of the plaintiffs and that they will suffer some harm if its enforcement is not enjoined." Order, 3/22/91, at 4. Second, it noted that the Project Labor Agreement will have "the effect of coercing all subcontractors to relinquish control over the terms of employment for their employees and forcing them to give up their right to operate as an open shop, without the benefit of collective bargaining ..." Order, 3/22/91, at 7.

the DOE, acting either directly or through a maintenance and operations contractor such as MK–F, from entering into a 'prehire' agreement such as the Project Agreement in this lawsuit." Order, 3/22/91, at 6. As to that question, the court held: "The Court is unaware of any reasons why the DOE may not directly, or through an agent, enter into a pre-hire construction agreement like the Project Agreement in this lawsuit as long as it would be valid if entered by private parties." *Id.* at 7.

The second issue the district court considered was "whether the *Machinists* doctrine should be extended to protect third parties like the plaintiffs in this action who will forfeit their federally protected right to resist union domination *only* if they choose to bid for a government contract." *Id.* at 6 (emphasis in original). On this issue, the district court held that it did "not see why the *Machinists* doctrine should be extended to protect third parties who are free to accept the bid conditions or look for other work. There is no inalienable right to work as a non-union contractor on publicly funded projects." *Id.* at 7.

Based on this legal analysis, the district court concluded that, as to the plaintiffs' motion for a preliminary injunction, the likelihood of success on the merits was weak. The district court relied on this reasoning when it later determined, in its orders of April 29 and June 20, that the NLRA claim did, in fact, fail on its merits.

## 2.

### MK–F/Building Trades Council Project Labor Agreement

The Project Labor Agreement executed by MK–F and the Building Trades Council is an example of a prehire agreement. A prehire agreement sets the terms and conditions of employment for workers hired by the signatory employer without the union's majority status first having been established. The NLRA establishes a general rule against such agreements. Pursuant to the statute, the Supreme Court has held that a union and an employer "commit unfair [labor] practices when they sign a collective-bargaining agreement recognizing the union as the exclusive bargaining representative when in fact only a minority of the employees have authorized the union to represent their interests." *NLRB v. Iron Workers*, 434 U.S. 335, 344, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978).

The NLRA, however, establishes a specific exception to the general rule for the construction industry. Section 8(f) of the NLRA, 29 U.S.C. § 158(f), provides, in relevant part:

> It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or, who upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members ... because (1) the majority status of such labor organization has not been established under the provisions of section of this Act prior to the naming of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment....

The Supreme Court has interpreted section 8(f) as follows:

> [Section] 8(f) allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under § 9 of the Act.

*Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266, 103 S.Ct. 1753, 1756, 75 L.Ed.2d 830

(1983). Thus, section 8(f) operates to validate prehire agreements in the construction industry.

The Project Labor Agreement in this case includes two provisions described by section 8(f). First, in a provision implicating section 8(f)(1), Article IV of the Project Labor Agreement establishes that MK–F will recognize the unions comprising the Building Trades Council as bargaining agents.[5] Second, in a provision implicating section 8(f)(3), Article VI of the Project Labor Agreement establishes the hiring hall procedure already described.

Neither side disputes that the Project Labor Agreement would be valid if entered into by a private general contractor. Plaintiffs claim, however, that the Project Labor Agreement was, in reality, negotiated by the DOE, and that this constituted governmental interference with private collective bargaining.

### 3.

### DOE Involvement in the Project Labor Agreement

The first question presented by the NLRA preemption issue is whether MK–F was acting as the DOE's agent when it negotiated the Agreement with the Building Trades Council. Plaintiffs argue that the extent of the DOE's involvement in negotiating the project labor agreement and its level of control over MK–F created sufficient governmental interference to implicate NLRA preemption. Defendants respond that the requirement that subcontractors abide by the Project Labor Agreement is not a state-enforced bid specification but rather a subcontract condition established by the negotiations of a private construction manager.

On this question, the district court assumed that the DOE was involved in the negotiation of the Project Labor Agreement. We adopt this assumption because the nature of the action under review compels us to do so. The district court disposed of the defendants' motions as if they were motions to dismiss. When we review a district court's grant of a motion to dismiss for failure to state a claim on which relief may be granted, all factual allegations are deemed admitted. Here, plaintiffs have alleged that the DOE directed the negotiation of the Project Labor Agreement.

### 4.

### Application of NLRA Preemption to a Prehire Agreement

Having resolved the first question on the NLRA preemption issue, we shall address the second, whether the NLRA prevents a governmental actor, federal or state, from negotiating a prehire agreement. The answer to this question involves a review of recent Supreme Court case law on the issue of NLRA preemption.

Congress enacted the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, in 1935 to ensure free collective bargaining. As the Supreme Court has repeatedly held, "[f]ree collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA." *Golden State Transit v. City of Los Angeles*, 475 U.S. 608, 619, 106 S.Ct. 1395, 1401, 89 L.Ed.2d 616 (1986) (quoting *New York Tel. Co. v. New York Labor Dep't*, 440 U.S. 519, 551, 99 S.Ct. 1328, 1346, 59 L.Ed.2d 553 (1979) (Powell, J., dissenting)).

The Court has interpreted the NLRA to prohibit certain types of governmental in-

---

**5.** Article IV of the Project Labor Agreement establishes the following:

Section 1. The bargaining unit under this Agreement shall comprise all craft employees who have been referred by a signatory Union and who are employed by the Employer or who will be employed in the future under the terms of this Agreement.

Section 2. The Employer recognizes the signatory Unions as the collective bargaining agents for its employees in the jurisdiction of the Knoxville Building and Construction Trades Council.

Thus, under this provision, the signatory union will serve as the bargaining agent for employees of a subcontractor even in the situation where the majority status of the union has not been established.

terference in the collective bargaining process. The Court has articulated two distinct NLRA-based prohibitions: *Garmon* preemption, *see San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); and *Machinists* preemption, *see also Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *Garmon* preemption is based predominantly on the primary jurisdiction of the National Labor Relations Board. The Court succinctly described the doctrine: "The so-called *Garmon* rule protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985) (citation omitted). *Garmon* preemption establishes that

> States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits. . . . [T]he *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act.

*Wisconsin Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986). *Garmon* preemption, however, does not apply to this case because neither side alleges that the DOE somehow infringed on the jurisdiction of the NLRB or that the DOE created a regulatory scheme governing conduct prohibited by the NLRA. Further, neither side argues that a *state* is attempting to regulate a labor practice.

*Machinists* preemption, however, may apply. In *Machinists*, the Court considered whether the Wisconsin Employment Relations Commission could order a union to cease a concerted practice of refusing to work overtime. The union's action was not protected by the NLRA. However, the court held that Wisconsin could not declare that the union's actions were unlawful:

Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board is "afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful."

*Machinists*, 427 U.S. at 149, 96 S.Ct. at 2557 (quoting *NLRB v. Insurance Agents*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1962)).

The Supreme Court addressed the scope of *Machinists* preemption in two recent decisions, *Golden State Transit v. City of Los Angeles*, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (*Golden State I*), and *Golden State Transit v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (*Golden State II*). Both cases considered the refusal of the Los Angeles City Council to renew a taxicab operating franchise until Golden State settled a labor dispute with the Teamsters, which represented the cab drivers. In *Golden State I*, the Court held that *Machinists* preemption

> precludes state and municipal regulation "concerning conduct that Congress intended to be unregulated." . . . Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left "to be controlled by the free play of economic forces."

*Golden State I*, 475 U.S. at 614, 106 S.Ct. at 1398 (quoting *Metropolitan Life Ins.*, 471 U.S. at 749, 105 S.Ct. at 2394, and *Machinists*, 427 U.S. at 140, 96 S.Ct. at 2553). The *Golden State I* Court continued:

> The settlement condition imposed by the Los Angeles City Council . . . destroyed the balance of power designed by Congress, and frustrated Congress' decision to leave open the use of economic weapons. In this case, the District Court and the Court of Appeals found that the city had conditioned the renewal of Golden State's franchise on the company's reaching a labor agreement with the Teamsters, but held that the city's action was

not pre-empted by *Machinists*. This was error as a matter of law.

*Golden State I*, 475 U.S. at 619, 106 S.Ct. at 1401. *Golden State I* did not consider whether *Machinists* preemption applied to the conduct of federal actors, in addition to the conduct of state and municipal actors.

The Court provided some guidance, however, when it returned to the issue in *Golden State II*. After *Golden State I*, the district court enjoined the city to reinstate the franchise, but held that the taxi company did not have a section 1983 action for damages because the city did not violate any rights. The Supreme Court reversed, and held that the taxicab company

> is the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process and that the NLRA gives it rights enforceable against governmental interference under § 1983.

*Golden State II*, 493 U.S. at 109, 110 S.Ct. at 450. In this opinion, the Court used language, albeit in dicta, which seemed to extend *Machinists* preemption to federal action:

> In *Machinists*, we reiterated that Congress intended to give parties to a collective-bargaining agreement the right to make use of "economic weapons," not explicitly set for in the Act, free of governmental interference.... "[T]he congressional intent in enacting the comprehensive federal law of labor relations" required that certain types of peaceful conduct "must be free of regulation." ... The *Machinists* rule creates a free zone from which all regulation, *"whether federal or state,"* ... is excluded.
>
> ....
>
> The *Machinists* rule is not designed—as is the *Garmon* rule—to answer the question whether state or federal regulations should apply to certain conduct. Rather, it is more akin to a rule that denies *either sovereign* the authority to abridge a personal liberty.

*Golden State II*, 493 U.S. at 110–11, 112, 110 S.Ct. at 451, 451–52 (quoting *Machinists*, 427 U.S. at 150, 153, 96 S.Ct. at 2557, 2559) (emphases added). The *Golden State* cases thus seem to hold that *Machinists* preemption prevents regulation, either by a state or the federal government, of aspects of labor-management relations left unregulated by the NLRA.

This case, however, presents the court with the question of whether *Machinists* preemption extends to governmental involvement in a prehire agreement. The degree to which the situation in this case should be governed by the *Golden State* holdings is central to the resolution of this issue. This case is one in which the governmental body is not directly accepting bids but rather has hired a private contractor as a construction manager.

This is exactly the factual scenario, on a state level, that the First Circuit faced in *Associated Builders & Contractors v. Massachusetts Water Resources Auth.*, 935 F.2d 345 (1st Cir.1991) (en banc) (*ABC v. MWRA*), *cert. granted,* — U.S. —, 112 S.Ct. 1935, 118 L.Ed.2d 541 (1992). Because the facts of *ABC v. MWRA* are similar to the present case, an analysis of the First Circuit's decision is helpful. We note, however, that the Supreme Court's recent decision to accept certiorari lessens its persuasive force.

A state entity, the Massachusetts Water Resources Authority (MWRA), retained Kaiser Engineers, Inc. as a construction manager. Kaiser then negotiated a "Master Labor Agreement" with the Building and Construction Trades Council. The agreement recognized the Trades Council as the sole bargaining representative of all craft employees and made the Trades Council's hiring halls the principal source for project labor. The MWRA approved the agreement and directed that a bid specification be added requiring all subcontractors to abide by the provisions of the agreement.

Associated Builders and Contractors (ABC) sought injunctive relief against enforcement of the bidding pursuant to the added specification. The district court denied the relief. On appeal, a panel of the First Circuit reversed and granted the injunction. The First Circuit then vacated the panel's opinion for rehearing en banc.

In a 3–2 decision en banc, the First Circuit again reversed the district court and ordered that the preliminary injunction be issued.

The court reasoned that in this context, the state is in its common role of a third party purchaser. If the state employer exclusion from the NLRA were interpreted to include all situations in which a state contracted for goods or services, the exception would likely swallow the rule. Allowing a state to impose restrictions upon *all* companies from which it purchases goods or services would effectively permit it to regulate labor relations between private employers and their employees thus totally displacing the NLRA....

*ABC v. MWRA,* 935 F.2d at 355 (footnote omitted) (emphasis in original). The court then held that the bid specification "frustrates the purpose of the Act and is, therefore, preempted." *Id.*

The dissent, authored by Chief Judge Breyer and joined by Judge Campbell, disagreed with the majority on two grounds. First, it stated that "the special construction industry exceptions in the Act itself show that Congress did not intend preemption." *Id.* at 361 (Breyer, C.J., dissenting). Second, the dissent argued that when the state is acting as purchaser, and not as a regulator, its actions are not subject to *Machinists* preemption. *Id.* at 365.

Subsequent to the First Circuit's decision in *ABC v. MWRA,* the Eighth Circuit reached the same result in *Glenwood Bridge v. City of Minneapolis,* 940 F.2d 367 (8th Cir.1991). After awarding a contract to plaintiff Glenwood Bridge, Minneapolis decided that it wanted to rebid the contract. Minneapolis subsequently "entered into a project labor stabilization agreement with the Minneapolis Building and Construction Trades Council, AFL–CIO, which provides for no strikes or lockouts. The City then incorporated this agreement into its new bidding documents." *Glenwood Bridge,* 940 F.2d at 368. The court adopted the First Circuit's approach, and held that "the City is squarely confronted with *Golden State I* and *Machinists*-preemption." *Id.* at 371. The court then granted Glenwood Bridge injunctive relief, enjoining Minneapolis from bidding the project. The court did so, however, over a vigorous dissent by Judge Heaney, who expressed his view that *ABC v. MWRA* was wrongly decided. Judge Heaney concluded that

the city is, in reality, a buyer that competes with other private and public buyers. It is entitled to the protection of a prehire agreement for the same reason as other owners or general contractors: it wants to preserve peaceful working conditions to get the job done on time. Congress has decided that prehire agreements make for a level playing field, and we should not interfere with the decision of the city that it is in its best interest to have such contracts.

940 F.2d at 374 (Heaney, J., dissenting).

In the present case, the district court explicitly rejected the initial panel decision in *ABC v. MWRA,* a holding ultimately adopted by the First Circuit en banc:

[T]he Court does not agree with the First Circuit's original analysis. The Court is unaware of any reason why the DOE may not directly, or through an agent, enter into a pre-hire construction labor agreement like the Project Agreement in this lawsuit as long as it would be valid if entered by private parties. And the Court does not see why the *Machinists* doctrine should be extended to protect third parties who are free to accept the bid conditions or look for other work. There is no inalienable right to work as a non-union contractor on publicly funded jobs.

Order, 3/22/91, at 7.[6] The district court had earlier reasoned:

---

**6.** At the time of the issuance of the district court's opinion denying the motion for a preliminary injunction, the First Circuit panel opinion, *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water* *Authority,* No. 90–1392 (1st Cir. Oct. 24, 1990), had been vacated pending rehearing en banc. That opinion had granted the injunction against the Master Labor Agreement. The First Circuit issued its en banc opinion, reaching the same

It is absolutely clear that under the *Machinists* doctrine, as explained in the *Golden State* cases, MK–F or the Council would have had a valid cause of action against the federal defendants for interference in their negotiations of the Project Labor Agreement. However, neither of these negotiating parties have brought this lawsuit. The plaintiffs here are third parties who will only be affected by it if they chose to contract with MK–F or work on DOE projects.

*Id.* at 6. The heart of the district court's reasoning is that if private contractors can enter prehire agreements, then so can the federal government.

After examining the statute and the relevant Supreme Court precedent, we agree with the district court and with the dissents in *ABC v. MWRA* and *Glenwood Bridge.*

We begin by noting a principle that the Supreme Court has repeatedly established, that "in any pre-emption analysis, the purpose of Congress is the ultimate touchstone." *Metropolitan Life Ins.,* 471 U.S. at 747, 105 S.Ct. at 2393. Unfortunately, the legislative history makes no mention of whether the drafters intended the exception permitting prehire agreements in the construction industry to apply to governmental actors. A close analysis of the structure of the section, however, suggests that Congress meant to regulate, although not prohibit, prehire agreements.

In section 8(f) of the NLRA, Congress explicitly permitted employers and unions in the construction industry to enter into prehire agreements that would otherwise constitute unfair labor practices. Congress, however, did not leave prehire agreements unregulated. Rather, section 8(f) specifies four elements of prehire agreements that would normally cause them to constitute an unfair labor practice, and then stated that these elements, when present in an agreement in the construction industry, would not serve as basis for a finding that the agreement constituted an unfair labor practice. 29 U.S.C. § 158(f)(1)–(4).

Importantly, Congress specifically limited the scope of the construction industry exception permitting prehire agreements. Section 8(f) includes a proviso which declares that a prehire agreement "which would be invalid but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e)...." 29 U.S.C. § 158(f). This proviso permits a challenge to a union's majority status during the term of a collective bargaining agreement. The Supreme Court explained the effect of this proviso:

> The [section 8(f)] exception is nevertheless of limited scope, for the usual rule protecting the union from inquiry into its majority status during the terms of a collective-bargaining contract does not apply to prehire agreements.... The employer and its employees—and the union itself for that matter—may call for a bargaining representative election at any time.
>
> The proviso expos[es] unions with prehire agreements to inquiry into their majority standing by elections under § 9(c)....

*NLRB v. Iron Workers,* 434 U.S. 335, 345, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978).

In *Golden State I,* the Court held that *Machinists* preemption precludes governmental regulation "concerning conduct that Congress intended to be unregulated." 475 U.S. at 614, 106 S.Ct. at 1398. Congress did not intend that prehire agreements be unregulated. Rather, the agreements are regulated by limiting their use to the construction industry, by denoting which elements that prehire agreements may contain, and by permitting representation elections during the term of the collective bargaining agreement. Thus, although construction industry prehire agreements are not *prohibited,* such agreements are still *regulated.*

Prehire agreements are easily distinguishable from the conditions imposed by

result, on May 15, 1991, approximately two months after the district court's opinion in this

case.

the City of Los Angeles in the *Golden State* cases. In that labor dispute, the taxicab company was attempting to end the strike by relying on an unregulated weapon. "Golden State was entirely justified in using its economic power to withstand the strike in an attempt to obtain bargaining concessions from the union." *Golden State I*, 475 U.S. at 615, 106 S.Ct. at 1399. Los Angeles, by conditioning the operating franchise on the settlement of the labor dispute by a certain deadline, deprived Golden State of its use of an economic weapon. Congress had left this weapon unregulated; therefore *Machinists* preemption applied. In this case, the MK–F/Building Trades Council Project Labor Agreement is an example of a labor practice that Congress closely regulated and *Machinists* preemption does not apply.

In addition to this statutory argument, a close analysis of Supreme Court precedent reveals that the Court has been reluctant to extend NLRA preemption to actions taken by governmental bodies acting as market participants, as opposed to regulators. In *Wisconsin Dep't of Indus. v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Court considered a Wisconsin statute that debarred persons who had violated the NLRA three times within a five-year period from doing business with the state. The Court held that Wisconsin's action was preempted by the NLRA, reasoning:

> We are not faced here with a statute that can even plausibly be defended as a legitimate response to state procurement constraints or to local economic needs, or with a law that pursues a task Congress intended to leave to the States. The manifest purpose and inevitable effect of the debarment rule is to enforce the requirements of the NLRA.

*Id.* at 291, 106 S.Ct. at 1063. We realize that *Gould* implicated *Garmon*, and not *Machinists*, preemption. However, there is a well-recognized general principle regarding preemption, that governmental spending decisions pursuant to economic goals are not subject to preemption. Chief Judge Breyer, in dissent, noted:

In the case before us, the record makes clear that the MWRA is participating in a market place as a general contractor, like a private buyer of services. Its role as buyer is not, in any sense, a sham designed to conceal an effort to regulate. That role is direct, normal, and necessary for *purchasing*, not *regulatory*, reasons.

*ABC v. MWRA*, 935 F.2d at 366 (emphasis in original). In this case, MK–F entered into the Project Labor Agreement because of a local economic need: the desire to avoid strikes by member unions of the Building Trades Council. If the DOE was acting at all, it was acting as a purchaser in the market place, not as a regulator.

We respectfully disagree with the First and Eighth Circuits, and agree with the reasoning of the district court. The NLRA does not preempt the action of the DOE in negotiating the Project Labor Agreement in this case.

## C.

### CICA–FAR Claim

Plaintiffs argue that the Project Labor Agreement, under which MK–F requires subcontractors to agree to the employee referral procedure, violates the statutes and regulations which require competition in contracting.

Congress passed the Competition in Contracting Act of 1984, 41 U.S.C. §§ 253 *et seq.* (CICA), to maximize competition in federal procurement. The statute provides, in relevant part:

> [A]n executive agency in conducting a procurement for property or services (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title ... and the modifications to regulations promulgated pursuant to section 2752 of the Competition in Contracting Act of 1984....

41 U.S.C. § 253(a)(1). The relevant Federal Acquisition Regulation (FAR) provides:

> The contracting officer shall, when contracting by negotiation, insert the clause at [48 C.F.R. § ] 52.244–5, Competition in

Subcontracting, in solicitations and contracts when the contract amount is expected to exceed the small purchase limitation....

48 C.F.R. § 44.204(e). 48 C.F.R. § 52.244-5 requires the contracting officer to insert the following clause in contracts with contractors:

> The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract.

This clause appears verbatim in the M & O contract between the DOE and MK–F. § I. 67.

CICA permits interested parties to a solicitation to protest a proposed award by a federal agency. CICA establishes a system under which proposed awards may be protested to the Comptroller General, but CICA does not limit the range of remedies available to interested parties. As the relevant provision establishes:

> This subchapter does not give the Comptroller General exclusive jurisdiction over protests, and nothing contained in this chapter shall affect the right of any interested party to file ... an action in a district court of the United States....

31 U.S.C. § 3556. Nevertheless, CICA does define the key terms "protest" and "interested party." A "protest" is

> a written objection by an interested party to a solicitation by an [sic] Federal agency for bids or proposals for a proposed contract for the procurement of property or services or a written objection by an interested party to a proposed award or the award of such a contract.

31 U.S.C. § 3551(1). An "interested party" is

> an actual or prospective bidder or offeror whose economic interest would be affected by the award of the contract or by failure to award the contract.

31 U.S.C. § 3351(2).

The district court initially denied summary judgment on the CICA-FAR claim "[b]ecause there is a genuine and material factual dispute over whether or not MK–F is an agent of the United States."

Order, 6/20/91, at 3. *See also* Order, 4/29/91, at 7. Later, however, the district court reconsidered. In its order of October 28, the district court dismissed the CICA-FAR claim, pursuant to Rule 12(b)(6), against the both federal defendants and MK–F. The court made one explicit factual finding and one implicit factual finding.

The explicit factual finding related to the bidding under the present contract. The district court noted: "There is nothing in the record to suggest that any of the defendants have been precluded from bidding on any MK–F subcontracting solicitations. In fact, the record indicates that the contractor plaintiffs have all been awarded contracts." Order, 10/28/91, at 4. The implicit factual finding related to the relationship between the DOE and MK–F. The district court, without actually labeling it a finding of fact, concluded that the plaintiffs failed to show that there was an express agency relationship between the DOE and MK–F. The court held:

> The federal agency involved in this lawsuit, the DOE, is not a party to the challenged Project Labor Agreement and, according to the terms of the Construction Management Agreement between MK–F and the DOE, MK–F is not permitted to enter into subcontracts in the name of the government or to bind the government. In the absence of an express agency relationship between MK–F and the DOE, the regulations governing federal agency procurement practices do not apply to MK–F's subcontract activities.

*Id.* at 3 (footnote omitted). In a footnote, the district court referenced section I.87(b) of the Management Agreement between MK–F and the DOE, which reads in relevant part: "Subcontracts shall be in the name of the contractor, and shall not bind or purport to bind the Government." Thus, the district court found that the party soliciting bids was MK–F, not the DOE. Even accepting the plaintiffs' allegation that the Project Labor Agreement reduces competition, we find that the district court did not err in concluding that the plaintiffs failed

to state a claim upon which relief can be granted under CICA.

We find that for the purposes of bidding on the contracts let by MK–F pursuant to the M & O agreement, none of the plaintiffs are interested parties, because the solicitations in question are not solicitations of a federal agency. 31 U.S.C. § 3351(1). The individual and association plaintiffs are clearly not interested parties because they did not bid on any contracts. The contractor plaintiffs are not interested parties because they are merely subcontractors in relation to the M & O contract between the DOE and MK–F, and subcontractors are not interested parties.

We note that FAR provisions buttress this conclusion. The governing regulation states specifically that CICA does not apply to M & O contractors, providing, in relevant part, that "the Competition in Contracting Act of 1984 is not applicable to management and operating contractor purchases." 48 C.F.R. § 970.7103(c)(2).

We also find guidance in the recent decision of the Federal Circuit in *US West Communications Servs. v. United States*, 940 F.2d 622 (Fed.Cir.1991). The factual setting is similar to this case. The dispute involved the procurement of a telecommunications system by Westinghouse Hanford Company, the M & O contractor for the DOE's facility in Hanford, Washington. Westinghouse awarded the contract to US West, and the losing bidder filed a protest to the General Services Administration Board of Contract Appeals (GSBCA). The GSBCA heard the protest and directed the DOE and Westinghouse to award the contract to the losing bidder. US West and Westinghouse appealed, arguing that the GSBCA had no jurisdiction to hear a protest by a potential subcontractor. The court held:

> The Competition in Contracting Act of 1984 (CICA), which gave the board bid protest authority, also does not indicate any change from the past practice that precluded subcontractor actions before the board. Congress instead recognized that the then-existing procedures of the board were suitable for considering fed-

eral agency procurements. Although Congress originally contemplated a broader definition of parties who could protest—"any person whose direct economic interest would be affected as contractor or *subcontractor*" (emphasis added)—the CICA, as enacted, provided for protest "to a solicitation by a Federal agency" and all references that would have permitted subcontractors to protest were deleted.

*US West*, 940 F.2d at 628 (emphasis in original) (citations omitted). The court vacated the GSBCA's decision, holding that the GSBCA lacked jurisdiction to hear an appeal brought by a potential subcontractor. We agree with the Federal Circuit. Potential subcontractors are not interested parties for the purpose of an action under CICA.

Plaintiffs advance the theory that MK–F, as an M & O contractor, is merely an agent of the DOE. Under this view, the DOE, and not MK–F, is the real contracting party, and therefore CICA applies to solicitations under the M & O agreement. The *US West* court considered this question as well, and noted that the M & O contract between the DOE and Westinghouse specifically provided that "[s]ubcontracts shall be in the name of the Contractor, and shall not bind or purport to bind the Government." *US West*, 940 F.2d at 629. Identical language appears in the M & O agreement between the DOE and MK–F. The Federal Circuit held that the GSBCA had erred in concluding that Westinghouse was the DOE's agent. *Id.* at 629–30. We again agree, and apply the same reasoning to the present case. The district court did not err in concluding that because MK–F was not the express agent of the DOE, the plaintiffs failed to state a claim for relief under CICA.

### III.

Because we affirm the final judgment of the district court dismissing the claims against the federal defendants, MK–F, and the Building Trades Council, we need not consider the denial of the plaintiffs' motion for a preliminary injunction.

## IV.

The district court's orders dismissing the plaintiffs' claims against the federal defendants, MK–F, and the Building Trades Council are AFFIRMED.

We decline to consider the plaintiffs' appeal of the denial of a preliminary injunction.

**In the Matter of Joseph D. SMITH, doing business as J.D. Management Services and G.L. Properties, Debtor.**