669 A.2d 1369

TORMEE CONSTRUCTION, INC., A CORPORATION OF THE STATE OF NEW JERSEY; NEW JERSEY CHAPTER, ASSOCIATED BUILDERS & CONTRACTORS, INC., A NOT–FOR–PROFIT CORPORATION OF THE STATE OF NEW JERSEY; UTILITY & TRANSPORTATION CONTRACTORS ASSOCIATION OF NEW JERSEY, INC., A NOT–FOR–PROFIT CORPORATION OF THE STATE OF NEW JERSEY; THOMAS EMICK, INDIVIDUALLY; AND JOSEPH D. LANDOLFI, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. MERCER COUNTY IMPROVEMENT AUTHORITY, A BODY POLITIC OF THE STATE OF NEW JERSEY AND THE COUNTY OF MERCER, DEFENDANT–RESPONDENT.

Argued September 11, 1995—Decided September 20, 1995—Opinion Released February 6, 1996.

*Steven E. Brawer* argued the cause for appellants (*Ravin Sarasohn Cook Baumgarten Fisch & Rosen,* attorneys).

*Anthony M. Massi* and *James R. Zazzali* argued the cause for respondent (*Paglione & Massi* and *Zazzali, Zazzali, Fagella & Nowak,* attorneys; *Mr. Massi* and *Kevin H. Main,* on the briefs).

*Frederick J. Rohloff* submitted a brief for *amici curiae* Associated Builders and Contractors, Inc., and Chamber of Commerce of the United States of America (*Archer & Greiner,* attorneys; *Mr. Rohloff, John C. Connell,* and *Louis L. Chodoff,* on the brief).

*Albert G. Kroll* submitted a brief for *amicus curiae* New Jersey State AFL–CIO (*Kroll & Gaechter,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

In *George Harms Construction Co. v. New Jersey Turnpike Authority,* 137 *N.J.* 8, 644 *A.*2d 76 (1994) (*Harms* ), we declared invalid, as inconsistent with public-bidding statutes, the designation of a particular labor organization as the sole source of labor for a public-construction project. On the facts of the present case, we likewise find invalid a specification requiring contractors to

enter into a "project labor agreement" (PLA) with "appropriate labor organizations."

–I–

On March 16, 1995, the Mercer County Improvement Authority (MCIA) solicited bids for a construction project captioned "Mercer County Library Phase One" (Phase One). Phase One involved a series of contracts for additions and alterations to the Ewing Township, Hopewell Township, and Lawrence Township branches of the Mercer County Library System. Subsequently, the MCIA advertised for bids for "Phase Two," which involved similar renovations to other branches in the system.

Included in the Phase One bid package, along with general project documents and specifications, was a copy of Executive Order 94–2, signed by the county executive. The executive order directed "that for appropriate construction projects, there be included in the bid specifications that each contractor, and subcontractor must sign a project agreement which will be negotiated by the construction manager, or the architect of the project, and the appropriate Building and Construction Trade Unions." This "Project Agreement" was to "establish the hours of work, wage rates, fringe benefits, dispute and grievance procedure, and any other terms that may be necessary to ensure a harmonious relationship between the parties." The order justified the "Project Agreement" provision as necessary to avoid "labor strife" and to ensure the timely and orderly completion of the project.

The deadline for the receipt of the bids was April 13, 1995. In a letter of April 6, 1995, addressed to MCIA's attorney, the Associated Builders & Contractors, Inc. (ABC) (a construction industry trade organization with a constituency of approximately 200 non-union firms), the Utility & Transportation Contractors Association of New Jersey (UTCA) (a construction-industry trade organization whose members include prospective subcontractors), and Tormee Construction, Inc. (Tormee) (an "open shop" contractor unaffiliated with any union) questioned the legality of the MCIA's Project

Agreement. Consequently, in a second addendum, the MCIA extended the date for the receipt of bids.

On April 20, 1995, the MCIA sent prospective bidders Addendum No. 3, which made numerous changes to the bidding documents. The first change replaced Executive Order 94-2 with Executive Order 95-1. This new order required that

> for appropriate construction projects, there be included in the bid specification that each contractor, and subcontractor must sign a project agreement which will be negotiated by the construction manager, or the architect of the project, and an appropriate labor organization in the building and construction industry.

The second change included a definition of "Appropriate Labor Organization." Addendum No. 3 defined an "appropriate labor organization" as

> an organization representing journeymen in one or more crafts or trades listed in N.J.A.C. 12:60–3.2, for purposes of collective bargaining and which has (1) entered into a labor agreement with an employer in the building and construction industry, (2) has represented journeymen, mechanics and apprentices employed in projects similar to the contracted work, and (3) has the present ability to refer, provide or represent sufficient numbers of qualified journeymen in the crafts or trades required by the contract to perform the contracted work.

Allegedly motivated by concerns for labor peace, quality of work, and efficient construction schedules, the MCIA adopted Resolution 95–62 on April 24, 1995. That resolution declared that the library projects were appropriate for PLAs. Neither in that resolution nor elsewhere did MCIA express the reasons justifying the PLA. Under MCIA policy, however, a successful bidder, to receive the award of the contract, must enter into a PLA with "appropriate labor organizations."

The PLA was to include a procedure for the resolution of grievances and jurisdictional disputes and for the elimination of the possibility of strikes, work stoppages, and lockouts. Addendum No. 4 set April 27, 1995, as the date for the receipt of bids. The total contract price was approximately $6.03 million, and the project was scheduled to last a maximum of 420 calendar days.

Tormee, ABC, UTCA, Thomas Emick (a non-union worker), and Joseph Landolfi (a resident and taxpayer of Mercer County) (collectively "plaintiffs") filed an action in lieu of prerogative writ

to restrain the MCIA from receiving bids and to declare the PLA invalid. On April 27, 1995, the Law Division found the PLA valid and dismissed the complaint. The Appellate Division denied plaintiff's request for a stay. Although we denied a stay, we granted direct certification. 141 *N.J.* 90 (1995).

On May 22, 1995, the MCIA, through Resolution 95–105, awarded the contracts for the library projects. We heard oral argument on September 11, 1995. On September 20, 1995, we issued an order declaring invalid the PLA specification in Phase Two and directing the removal of that specification from the bid documents.

–II–

■ In *Harms*, we analyzed the substantive law relating to the validity of PLAs. No useful purpose would be served by repeating that analysis here. Suffice it to state, the validity of a PLA is primarily a matter of state law. *Harms, supra*, 137 *N.J.* at 24–27, 43, 644 *A.*2d 76. The most recent decision of the United States Supreme Court, *Building and Construction Trades Council v. Associated Builders & Contractors, Inc.*, 507 *U.S.* 218, 113 *S.Ct.* 1190, 122 *L.Ed.*2d 565 (1993) (*Boston Harbor*), did not preempt state courts from considering the validity of a PLA. *Harms, supra*, 137 *N.J.* at 26–27, 644 *A.*2d 76.

■ The basic policy underlying the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49, is to promote competition and combat corruption in public bidding. *Cubic W. Data, Inc. v. New Jersey Turnpike Auth.*, 468 *F.Supp.* 59, 63 n. 4 (D.N.J.1978). *Harms* involved a PLA that specified the use of a solitary labor organization. Here, in contrast, the MCIA's PLA requires dealing with "appropriate labor organizations." Although less restrictive than the PLA in *Harms*, the subject PLA still contravenes the underlying purposes of public-bidding laws. Under the specifications and definitions of the MCIA PLA, only two kinds of labor organization could qualify: an organization like the Building Trades Council, "comprised of several different unions represent-

ing various crafts," *Harms, supra,* 137 *N.J.* at 24, or a multi-craft union, the members of which perform a variety of construction tasks. That restriction, like the one limiting the choice to a single labor organization, binds too tightly to satisfy the statutory requirements for bidding on local public contracts.

By any test, contracts for public improvements are among the most important contracts that public entities enter. 34 Michael A. Pane, *New Jersey Practice, Local Government Law* § 204 at 343 (2d ed. 1993). Taxpayers have an interest in assuring that public entities are cost-effective in spending public funds. Accordingly, the State's competitive-bidding statutes direct that all contracts requiring public advertisement for bids "shall be awarded to the lowest responsible bidder." *N.J.S.A.* 40A:11–6.1. That direction guards "against favoritism, improvidence, extravagance and corruption" in the awarding of state and municipal contracts. *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.2d* 327 (1975). As we stated in *Harms,* "[a]voidance of any potential for contract manipulation is a central theme of all public-bidding doctrine." 137 *N.J.* at 38, 644 *A.2d* 76.

Competitive public bidding obviously fosters competition among bidders. The more companies that can bid on a project, the greater the likelihood that the public entity will receive the lowest possible contract price from responsible bidders. *Skakel v. Township of North Bergen,* 37 *N.J.* 369, 378, 181 *A.2d* 473 (1962).

PLAs can contravene the goals of competitive bidding. By mandating that workers belong to certain limited labor organizations, PLAs restrict bidders to contractors with relationships with those labor organizations. The obvious effect of such a restriction is to lessen competition. Additionally, PLAs can increase labor costs by excluding or reducing the number of employable non-union workers.

In some situations, however, PLAs can serve useful purposes. By preventing the expiration of collective bargaining agreements of various unions during the term of a construction contract, a

PLA can provide substantial public benefits and resolve disputes among the trades working on the project.

Recently, the Appellate Division of the New York State Supreme Court sustained a PLA. *New York State Chapter, Inc. v. New York Thruway Auth.*, 620 *N.Y.S.*2d 855, 207 *A.D.*2d 26 (1994), *leave to appeal granted*, 86 *N.Y.*2d 703, 631 *N.Y.S.*2d 607, 655 *N.E.*2d 704 (1995) (*New York Thruway* ). In *New York Thruway*, the Appellate Division held that the Thruway's use of a PLA was a valid bid specification that did not violate the competitive-bidding requirements of New York law. *Id.* at 856, 207 *A.D.*2d 26. That case, which involved the refurbishment of the Tappan Zee Bridge, exemplifies the exceptional circumstances that could justify recourse to a PLA.

"[A]ccording to the Thruway Authority, [it] is the largest such construction project in size, complexity and cost since the bridge was constructed." *Ibid.* The project "would subject the work to the jurisdiction of some 19 local unions with separate labor contracts having different starting times, scheduling restrictions, holidays, grievance resolution procedures, and other terms and conditions of employment." *Ibid.* The Thruway Authority directed its own consultant to negotiate with the various trade unions having jurisdiction over the work to be performed. It also directed the consultant

> to seek concessions from all the unions concerning work rules and other terms and conditions. The result of the consultant's efforts was the PLA which, *inter alia*, creates uniform procedures for dealing with all disputes, contains a comprehensive no-strike clause, establishes a standardized work week, permits flexibility in scheduling, and contains other provisions which, according to the Thruway Authority, standardize the terms and conditions of employment and will reduce the cost of the project.
>
> [*Id.* at 856–57, 207 *A.D.*2d 26.]

Significantly, the PLA allowed contractors and subcontractors to retain up to twelve percent of their current work force. The PLA specifically recognized that the successful bidder need not be a union contractor and that the unions must comply with the terms of the PLA whether the successful bidder was a union or non-union contractor. Furthermore, the PLA expressly prohibited discrimination against prospective employees on the basis of union

membership. Workers were not required to join the union. The PLA also recognized the right of the contractors to determine the competency of workers, to select workers to be laid off, and to use any other source of workers if a union hall did not refer workers within forty-eight hours. On those facts, the court held that the PLA did not conflict with public-bidding laws.

In contrast, the improvements to the MCIA library system lack the scope and complexity of the New York Thruway project. Furthermore, the MCIA's PLA did not permit contractors to hire a stated percentage of their non-union employees. The MCIA merely attached to the bid specifications for Phase Two a model form that neither bound the "appropriate labor organizations" nor assured coordination among them. In essence, the MCIA's PLA, contrary to public-bidding laws, impermissibly restricts contractors to a union-only work force. *Harms, supra,* 137 *N.J.* at 39, 644 *A.*2d 76.

The PLA, moreover, conflicts with the policy underlying Executive Order No. 11 signed by Governor Christine Todd Whitman on March 21, 1994. That order contemplates that state agencies might include a PLA in a public works project on a "project by project basis where it has been determined that such project agreement will promote labor stability and advance the state's interest in cost, efficiency, quality, safety and/or timeliness." Although not binding on local public contractors, the executive order represents state policy. As we read it, the executive order does not contemplate the use of PLAs on routine construction projects. The MCIA project is, in our judgment, such a project. Whether measured by dollars, estimated time for construction, or complexity of the project, the MCIA project does not justify a PLA limited to two unions. Although the total cost of the project might seem large by some standards, the sum is not substantial when compared to the $425 million cost of the tunnel in *Boston Harbor* or the $1 billion cost for the work on the Tappan Zee Bridge in *New York Thruway.*

In reaching that result, we recognize that the Legislature is better suited than the judiciary to determine "the size, complexity

and cost" of projects that justify recourse to a PLA. *New York Thruway, supra,* 620 *N.Y.S.*2d at 856, 207 *A.D.*2d 26. We also believe that the Legislature is better suited to accommodate the several interests of labor, management, and the public. *Harms, supra,* 137 *N.J.* at 45, 644 *A.*2d 76. Until such time as the Legislature acts, however, we are obligated to adjudicate such bid specifications case-by-case.

Our dissenting colleagues repeat the same arguments that they originally advanced and that we rejected in *Harms.* To support their position, they rely on a string citation of cases from other jurisdictions. *Post* at 157–159, 669 *A.*2d at 1376–1377. Because we rely on the New Jersey competitive-bidding statutes, cases based on statutes from other jurisdictions are of little help. The cases cited by the dissent, moreover, are readily distinguishable. *General Building Contractors of New York State, Inc. v. Dormitory Authority of the State of New York,* 620 *N.Y.S.*2d 859, 210 *A.D.*2d 788 (1994), *leave to appeal granted,* 86 *N.Y.*2d 703, 631 *N.Y.S.*2d 607, 655 *N.E.*2d 704 (1995), decided on the same day as *New York Thruway,* involved a project of indeterminate cost, size, and duration. *Phoenix Engineering, Inc. v. MK–Ferguson of Oak Ridge Co.,* 966 *F.*2d 1513 (6th Cir.1992), *cert. denied,* 507 *U.S.* 984, 113 *S.Ct.* 1577, 123 *L.Ed.*2d 146 (1993), and *Associated Builders & Contractors, Inc. v. City of Seward,* 966 *F.*2d 492 (9th Cir.1992), *cert. denied,* 507 *U.S.* 984, 113 *S.Ct.* 1577, 123 *L.Ed.*2d 146 (1993), involved claims based on federal, not state, law. The PLA in *Minnesota Chapter of Associated Builders & Contractors, Inc. v. County of St. Louis,* 825 *F.Supp.* 238 (D.Minn.1993), required the successful bidder to recognize a specific union as the bargaining agent for all employees, contrary to *Harms.* In *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 *F.*2d 367 (8th Cir.1991), the Eighth Circuit Court of Appeals directed the entry of a preliminary injunction for a contractor who was the low bidder on a bridge construction contract. After opening of the bids, the City of Minneapolis tried to condition the award, among other things, by requiring the contractor to agree to a PLA. The Eighth Circuit directed the United States District Court to enter a

preliminary injunction ordering the city to award the contract without the PLA, provided the successful bidder posted a bond. The opinion hardly constitutes an endorsement of the PLA in the present case.

The judgment of the Law Division is reversed, and the matter is remanded to it for entry of a judgment consistent with this opinion.

HANDLER, J., dissenting.

## I

In this case, the Court invalidates a public bidding specification that requires the successful bidder to negotiate a project labor agreement. The agreement was required to assure the expeditious completion of the project by avoiding delays attributable to labor stoppages. The project itself involves the substantial improvement and renovation of the county library system. The work entails three successive phases of construction, each covered by a separate contract. The first phase of the project relates to construction on the Ewing, Hopewell and Lawrence branches of the Library System. Phase Two involves three other branches of the Library System, and Phase Three is expected to consist of renovations to two other library branches. The entire project will have an approximate cost of $18 million dollars, and will take several years to complete.

The Mercer County Improvement Authority ("MCIA"), in the issuance of the first-phase bid documents containing specifications, adopted Executive Order 94–2. The Executive Order expressed the finding that such an agreement was necessary to avoid labor strife and to ensure timely and orderly completion of the project. The Order directed that in "appropriate construction projects," each contractor and subcontractor was required to sign a project labor agreement. The Order provided that the agreement was "to establish the hours of work, wage rates, fringe benefits, dispute and grievance procedures and any other terms that might be necessary to ensure a harmonious relationship between the parties."

The specification further required that a contractor would have to bargain with a labor organization that could adequately represent the interest of the workers, so that labor peace could be assured. The project labor agreement was to be negotiated between the construction manager or architect of the contractor and "the appropriate Building and Construction Trade Unions." Under Executive Order 94–2, the only entity qualified to bargain on the part of the workers was the Mercer County Building and Trades Council ("BTC").

Bids were scheduled to be received on April 13, 1995, but on April 6, counsel for the Associated Builders and Contractors, the Utility and Transportation Contractors Association of New Jersey, and Tormee Construction, Inc. requested that the MCIA delete sections of the project agreement. Following discussions concerning the general terms for a project labor agreement, the MCIA issued a second addendum to the bid documents, expressed in Executive Order 95–1, which made several changes in the specifications and extended the deadline for bids until April 27, 1995. One of the changes deletes the specific reference to the BTC, and instead specifies that the project labor agreement be negotiated with an "Appropriate Labor Organization in the Building and Construction Industry."

Notwithstanding those changes, plaintiffs, claiming that the specification requiring a project labor agreement was unlawful, on April 25, 1995, filed a declaratory judgment action, and sought temporary and permanent injunctions to restrain the MCIA from receiving bids on the construction projects. The Law Division found the requirement for the PLA valid, dismissed the complaint, and denied a request to stay the judgment. The trial court stressed that the original specification, which required negotiation of the project labor agreement with a member in the Building and Trades Council, was invalid under *George Harms Construction Co., Inc. v. New Jersey Turnpike Authority*, 137 *N.J.* 8, 644 *A.*2d 76 (1994) because it was too restrictive in limiting a contractor's source of labor to a single union. However, the trial court found

that the amended specification, which required an agreement with an "appropriate labor organization," did not offend *Harms,* and thus the change in the specifications rendered the PLA requirement valid.

The Court granted plaintiffs' petition for direct certification. 141 *N.J.* 90, 660 *A.*2d 1191 (1995). Subsequently, the New Jersey State AFL–CIO filed a motion to appear as *amicus curiae,* which was granted.

Ten contractors submitted bids for the contract, and the combined estimate of the three lowest bidders was approximately $276,000 dollars under the MCIA's budget. This first phase of the project was scheduled to last a maximum of 420 calendar days. Plaintiffs then moved for a stay of the award of bids for Phase One of the Project. On May 5, this Court denied the stay and, on May 22, 1995, the MCIA awarded three contracts for construction on the three library branches in Phase One, for an aggregate cost of approximately $6.03 million.

Thereafter, in connection with Phase Two of the project, plaintiffs moved for a stay of the receipt and award of bids. On September 14, 1995, the stay was temporarily granted in respect of the opening of bids, the award of the contracts, and the commencement of construction. The receipt of bids, however, was not stayed. On September 20, the Court granted a permanent stay, and in its order declared that the project labor agreement requirement was invalid. Accordingly, the Court ordered the return of all bids, and allowed the MCIA the option of having the project rebid without the PLA requirement. The Court's opinion now explains its reasons for declaring the project labor agreement to be invalid. I disagree with its reasoning and conclusion.

## II

The premise of the majority opinion is that public bidding policy "requires competition among bidders. The more companies that can bid on a project, the greater the likelihood that the public entity will receive the lowest possible price from responsible

bidders." *Ante* at 148, 669 *A*.2d at 1371. My problem with the majority's approach is not in its recognition of the vital importance of competition in public bidding. Rather, I am disturbed by its singular focus on competition, seemingly to the exclusion of other important considerations that bear on the responsibility of bidders and the sound and expeditious completion of public works.

Without doubt, competition is essential in the awarding of public contracts. It is well established that

the fundamental philosophy of our competitive bidding statutes is that economy be secured and extravagance, fraud and favoritism prevented. Such statutes are designed to safeguard the public good and should be rigidly enforced by the courts to promote that objective. This common good is best advanced by cultivating the most extensive competition possible under the circumstances and municipalities should organize their efforts in that direction.

[*Skakel v. North Bergen*, 37 *N.J.* 369, 378, 181 *A*.2d 473 (1962) (citations omitted) ].

Requirements that needlessly limit and constrict competition can compromise the integrity of the public bidding system. The promotion of competition in public bidding on the awarding of contracts serves the public interest by discouraging "favoritism, improvidence, extravagance and corruption." *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.*, 67 *N.J.* 403, 410, 341 *A*.2d 327 (1975) (quoting *Hillside Tp. v. Sternin*, 25 *N.J.* 317, 322, 136 *A*.2d 265 (1957)).

However, as important as competition in public bidding may be, competition is not an end in itself. Other factors—experience, responsibility, honesty and skill—are all important to assure that public work is properly performed in the public interest. Consequently, there is no absolute mandate that "an agency must, in every action it takes, promote competition at the expense of all other concerns." *Harms, supra*, 137 *N.J.* at 44, 644 *A*.2d 76 (Handler, J., concurring). If soundness, efficiency, and integrity can otherwise be assured, "[t]he ability to perform the work required is of the very essence of any contract for public work," *Bil Jim Construction. v. Board. of Education*, 236 *N.J.Super.* 603, 605, 566 *A*.2d 585 (App.Div.1989). Thus, a public body may impose standards designed to ensure that bidders are able to

perform the work to the satisfaction of the contracting agency, and to prescribe specifications based on those standards to determine the eligibility of contractors to engage in public contracts.

Any standard governing capacity to perform the work, whether set by the job specifications or inherent in the nature of the job itself, will exclude from the bidding process parties that are unqualified because they cannot meet that standard. The fact that a specification "limits the number of bidders simply because some potential bidders cannot satisfy the specification" does not render that specification "unreasonable and invalid." *Harms*, 137 *N.J.* at 49, 644 *A.*2d 76 (Handler, J., concurring). Competition that is circumscribed by a valid standard reasonably related to the work is not "anti-competitive" within the purpose and intendment of the public bidding laws. *Ibid.*

Given the importance of competition in bidding, it is clear that any standard that restricts competition must be directly related to the performance of the public work. The Local Public Contracts Law, *N.J.S.A.* 40A:11–13, provides that

specifications for an acquisition under this act, whether by purchase, contract or agreement, shall be drafted in a manner to encourage free, open and competitive bidding. In particular, no specifications under this act may:

(a) Require any standard, restriction, condition or limitation not directly related to the purpose, function or activity for which the purchase, contract or agreement is made

Under this statute and the prevailing case law, specifications are deemed anti-competitive and invalid only when they are not reasonably related to the proposed project. *Greenberg v. Fornicola*, 37 *N.J.* 1, 178 *A.*2d 339 (1962); *Waszen v. Atlantic City*, 1 *N.J.* 272, 63 *A.*2d 255 (1942); 18 Eugene McQuillan, *The Law of Municipal Corporations*, § 29.44 (3d ed. 1984). A restriction that reduces competition and cannot be justified as reasonably necessary for the completion of the work is one that in all likelihood opens the door to favoritism, fiscal extravagance, improvidence and corruption.

In this case, the critical inquiry should be not whether the specification that requires a project labor agreement places a limit

on competition. Rather, the question must be whether such a specification is reasonably related to the work proposed by the public contract. "A specification that limits the number of bidders should invite critical scrutiny, but it should not be stigmatized as unreasonable without such scrutiny." *Harms, supra,* 137 *N.J.* at 49, 644 *A.*2d 76 (Handler, J., concurring). Even though it may reduce the number of parties eligible to compete for the contract, the specification calling for a PLA is not an invalid, anti-competitive standard, if the PLA is reasonably related to the satisfactory performance and completion of the public job.

I think that the record in this case supports a finding that the project labor agreement is reasonably related to the work proposed. In the briefs and in oral argument, counsel for the MCIA described the Authority's previous problems with delays, work stoppages and cost overruns in the recent construction of the Parkway School. The Authority adopted a resolution, Mercer County Improvement Authority Resolution No. 95–154, which clearly identifies its problems with its construction projects in the past, and demonstrates the need for the requirement of a PLA to prevent such problems in the proposed library construction.

It has been widely recognized and clearly established that where the experience of a public contracting agency confirms the risk that its project will be threatened by labor disputes, interrupted by strikes or delayed by work stoppages, a valid and effective method of addressing and preventing those contingencies is through a project labor agreement. *E.g., Building and Constr. Trades Council v. Associated Builders and Contractors, Inc.,* 507 *U.S.* 218, 113 *S.Ct.* 1190, 122 *L.Ed.*2d 565 (1993) (hereinafter *Boston Harbor* ); *New York State Chapter Inc. v. New York State Thruway Authority,* 620 *N.Y.S.*2d 855, 207 *A.D.*2d 26 (1994), *appeal granted,* 86 *N.Y.*2d 703, 631 *N.Y.*2d 607, 655 *N.E.*2d 704 (1995) (hereinafter *Tappan Zee* ); *General Building Contractors. of New York State, Inc. v. Dormitory Authority of the State of New York,* 620 *N.Y.S.*2d 859, 210 *A.D.*2d 788 (1994); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. St. Louis*

*County,* 825 *F.Supp.* 238, 244 (D.Minn.1993); *Associated Builders and Contractors, Inc. v. City of Seward,* 966 *F.*2d 492, 499 (9th Cir.1992), *cert. denied,* 507 *U.S.* 984, 113 *S.Ct.* 1577, 123 *L.Ed.*2d 146 (1993); *Phoenix Engineering, Inc. v. MK–Ferguson of Oak Ridge Company,* 966 *F.*2d 1513 (6th Cir.1992), *cert. denied,* 507 *U.S.* 984, 113 *S.Ct.* 1577, 123 *L.Ed.* 146 (1993); *cf. Glenwood Bridge, Inc. v. City of Minneapolis,* 940 *F.*2d 367 (8th Cir.1991) (indicating project labor agreement invalid if superfluous in light of existing anti-strike conditions).

Further, the feasibility and utility of a project labor agreement as a method to overcome the threat of labor strife, stoppages and delays has been confirmed by two successive executive administrations. Governor Florio's Executive Order No. 99 (dated September 13, 1993), 25 *N.J.R.* 4543 (October 4, 1994); Governor Whitman's Executive Order No. 11 (dated March 21, 1994), 26 *N.J.R.* 1558–59 (April 18, 1994). Governor Florio's Order mandated that all public projects proceed pursuant to a project labor agreement. Governor Whitman's Order superseded the prior Order, emphasizing that project labor agreements be applied to public contracts on a project-by-project basis according to the problems and needs of the particular public jobs. Both Orders have recognized the necessity and reasonableness of such agreements.

The majority does not impugn the reasonableness of project labor agreements; nor does it invalidate the authority of the executive branch of government, state and local, to determine if a project labor agreement will assure the successful and expeditious completion of a public project. Nevertheless, it presumes that the judiciary is in a better position to determine when a project labor agreement is reasonably called for. Thus, it suggests that only large-scale projects should be eligible for a project labor agreement. *Ante* at 148–149, 149–150, 669 *A.*2d at 1371–1372, 1372. Some of the cases that addressed the validity of project labor agreements involved public contracts of a much greater scale than the library improvement and expansion in this case. *The Tappan Zee* project is certainly an example of a complicated project, totalling $1 billion and requiring coordination of nineteen labor

unions. The *Boston Harbor* case is often cited for its huge size and $6.1 billion cost. Nonetheless, I question the majority's assertion that a project labor agreement is allowable in public projects only or primarily when the project is of massive size, scope or cost.

A standard that allows PLA's only in grand-scale projects of great cost would leave local governments at a distinct disadvantage in dealing with labor unrest and stoppages in their public works. Therefore, I conclude that considerations of size and cost must not be made in a vacuum; rather, the determination of the need for a PLA must include a consideration of the size and cost of the project *relative* to the need for the project, the importance of timely completion, and the resources of the contracting governmental agency. Although the project in this case is modest in comparison to the undertakings in *Boston Harbor* and *Tappan Zee*, there is still reason to find a project labor agreement appropriate. This project calls for significant improvements of the county library system; it involves three major phases of work, each covered by separate contracts; its anticipated costs are six million dollars for each contract phase, for a total contract cost of eighteen million dollars. The public work is clearly substantial, needed and important.

Further, there is a documented history of labor disputes on prior projects that impelled the MCIA to address and confront the threat of delays arising from labor strife. That experience justifies the determination made by local government in this case that the interests of efficiency and timely completion of the entire project called for the use of a PLA.

I also disagree with the majority that this project does not qualify under Governor Whitman's Executive Order, which allows PLA's on a "project by project" basis. *Ante* at 149–150, 669 *A*.2d at 1372. When the county's history of labor problems is considered in conjunction with the nature and the scope of the project relative to the needs and resources of the contracting agency, it is clear that this project passes muster under Governor Whitman's Executive Order.

The majority also betrays, in this case, a distrust of local government that goes beyond the obligation to demonstrate that a PLA is reasonably related to the satisfactory completion of the library project. The majority is unwilling to allow the use of a PLA unless the agreement required by bidding specifications also contains comprehensive and detailed terms and conditions that will constitute a virtual iron-clad guarantee of labor peace. The Court's detailed replication of the extensive provisions of the Tappan Zee Bridge project agreement is offered as the exemplar of an acceptable and valid PLA. *Ante* at 148, 669 *A*.2d at 1371. However, a valid specification for a project labor agreement does not require the itemization of all of its operative terms to satisfy the standard that it be reasonably related to the work. It should suffice if the proposed agreement, as the one in this case, requires the inclusion of not only basic terms that will "establish the hours of work, wage rates, fringe benefits, dispute and grievance procedures," but also "any other terms that might be necessary to ensure a *harmonious relationship between the parties*."

The majority's insistence on the necessity to detail the terms of the agreement also recalls Justice O'Hern's opinion in *Harms*, which briefly addressed the constitutional implications of a project labor agreement. Justice O'Hern's constitutional analysis included an assessment of the public need for a project labor agreement measured against the availability of other (presumably "better") means of achieving the goals of labor peace and uninterrupted work, such as mediation agreements and no-strike clauses. *Harms, supra,* 137 *N.J.* at 32, 644 *A*.2d 76. Similarly, in the present case, the majority once again seems to feel that a project labor agreement should not be permitted where its purposes might be accomplished by different means. Although there may be more narrowly-drawn means to assure the accomplishment of the goals of prevention of labor strife, the efficient mediation of disputes, and the expeditious performance of the work, there is no showing that the proposed agreement, which must include terms necessary to assure labor peace, cannot be fully carried out.

The majority, I believe, also uncritically characterizes the project labor agreement in this case as being invidiously anti-competitive. It thus accepts the plaintiff's representations that the PLA would restrict prospective contractors to a choice of one of two labor organizations as the bargaining agent for all workers on the project. *Ante* at 147, 669 *A.*2d at 1371. The majority credits the plaintiff's allegations that the use of the PLA would effectively prevent non-union contractors from using non-union labor and thus preclude non-union contractors from bidding on the job. However, according to *amicus,* the AFL–CIO, the contractor is not limited by the proposed PLA to employing union workers exclusively. The contractor would have certain rights under the agreement, such as the right to retain key employees as well as the right to turn to other sources of labor if the supply of union labor is inadequate or unsatisfactory. Thus the PLA provides sufficient flexibility to allow the contractor to retain a measure of control over the job, even though the union would be the overall source of labor for the project. In addition, the majority fails to note that the MCIA received ten bids on this contract, and does not demonstrate whether participation in the bidding would have been measurably enlarged without a restriction that would assure labor peace in the performance of the contract.

I acknowledge that this case clearly raises important and complex considerations of governmental policy and implicates a number of controversial issues. Ultimately, those concerns, thus far determined by the executive and judicial branches, should be addressed by the Legislature, the branch of government most fit and best able to weigh and resolve the policy consideration implicated by the use of project labor agreements in public contracts.

I am satisfied, however, on the basis of this record, that the requirement of the project labor agreement is reasonable and does not constitute an invalid anti-competitive standard.

I therefore dissent from the majority opinion.

Chief Justice WILENTZ joins in this opinion.

*For reversal and remandment*—Justice POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—5.

*For affirmance*—Chief Justice WILENTZ, and Justice HANDLER—2.