**QUEEN CITY CONSTRUCTION, INC., Appellant,**

v.

**CITY OF ROCHESTER, et al., Respondents,**

**Southeast Minnesota Building and Construction Trades Council, Respondent.**

No. CX–99–889.

Court of Appeals of Minnesota.

Dec. 28, 1999.

Review Denied March 14, 2000.

Gregg J. Cavanagh, Maple Grove, MN (for appellant).

Terry L. Adkins, Rochester City Attorney, Rochester, MN (for respondents City of Rochester and Common Council of Rochester).

Richard A. Miller, Brendan D. Cummins, Miller O'Brien Bloom, Minneapolis, MN (for respondent Southeast Minnesota Building and Construction Trades Council).

Considered and decided by CRIPPEN, Presiding Judge, SCHUMACHER, Judge, and DAVIES, Judge.

## OPINION

SCHUMACHER, Judge.

Queen City Construction, Inc. appeals the district court's denial of a temporary injunction preventing respondent City of Rochester from requiring successful bidders on a public construction project to sign a project labor agreement (PLA). We affirm.

## FACTS

Rochester intends to make extensive improvements to the Mayo Civic Center, which it owns and operates. It plans to build a new 25,200–square–foot exhibit hall, as well as expand and renovate other parts of the center.

On January 14, 1999, Jim Ibister, the Executive Director of the Mayo Civic Center, wrote the Rochester mayor and respondent Common Council of Rochester suggesting that the city enter into a PLA for the civic center construction project. A PLA is an agreement between the owner of a construction project and a labor organization in which the owner of the project agrees to designate that organization as the exclusive bargaining agent for all employees working on the project and employ only contractors and subcontractors who agree, for the purposes of work on that project, to abide by the terms of collective bargaining agreements that organization has in place. In return, typically, the labor organization agrees that there will be no strikes, slowdowns, picketing, sympathy actions, or any other kind of work stoppage or disruptive action for the life of the project, even if one or more of the collective bargaining agreements should expire during the course of the project.

Ibister told the mayor and Common Council that "a unique set of circumstances exist which makes [it] critical that this project be completed on time and within budget," including (1) the space that was to be constructed was already booked, so failure to complete the project on time would cause both a loss of revenue and a loss of credibility with the civic center's customers; (2) a limited budget left little room for increased costs caused by delay; (3) close coordination among all workforces would be necessary to avoid disrupting the civic center's ongoing operations during construction; (4) a near-record level of construction in the Rochester area during the project made for a very tight labor market, and made it more important to take steps to ensure an ample, uninterrupted supply of skilled labor; and (5) space and safety considerations would make it very difficult to establish separate gates for union and non-union personnel. Furthermore, Ibister told the mayor and Common Council that the civic center had

in the past lost business because of labor problems on construction projects.

On February 17, 1999, the Common Council passed a short resolution approving without explanation the use of a PLA on the civic center project. But a "Request for Council Action" prepared for the February 17 meeting attached the Ibister letter in explanation for its request that the council "[r]equest a motion adopting the prepared resolution adopting the reasons for the project labor agreement."

On or about March 24, 1999, Queen City brought this action for declaratory and injunctive relief, seeking to prevent Rochester from imposing the bid specification that low bidders on the civic center project must agree to sign the PLA in order to receive the contract. In its complaint, Queen City alleged that the bid specification was illegal and would make it impossible for Queen City to bid successfully on the contract.

On April 5, 1999, the Common Council passed a second resolution concerning the adoption of a PLA for the civic center project, in which it found that PLAs facilitated the timely and efficient completion of substantial construction projects by

(a) making available a ready and adequate supply of highly trained and skilled craft workers;

(b) permitting public owners and contractors to accurately determine project labor costs at the outset and to establish uniform working conditions for all construction crafts for the duration of the project;

(c) allowing for the negotiation of specialized terms and conditions which because of the particular circumstances relating to a particular project, may be required for the effective construction of the project;

(d) providing a negotiated commitment which is a legally enforceable means of assuring labor stability and labor peace over the life of the project;

(e) avoiding work stoppage following expiration of a collective bargaining agreement; and

(f) facilitating equal employment opportunities on the project.

A "Request for Council Action" prepared for the April 5 meeting explained that "due to a miscommunication between the City Attorney's Office and the City Administrator's Office, a resolution adopting the reasons for a project labor agreement was not prepared" in connection with the February 17, 1999 resolution. The "Request for Council Action" observed, however, that the January 14, 1999, Ibister letter had documented the need for a PLA.

Under the PLA approved by the Common Council, both union and non-union contractors may bid for contracts, but all successful bidders must agree to abide by the terms of the PLA during the project. That means that successful bidders will have to follow union work rules, contribute to union benefit plans, and use union hiring halls during the project. (Federal law requires union hiring halls to be nondiscriminatory, that is, to refer both union and non-union personnel for jobs without discriminating on the basis of union membership. 29 U.S.C. § 158(a)(3), (b)(1)(A), (b)(2).) The obligation to comply with the PLA (and its incorporated collective bargaining agreements) extends only to the civic center project and only during that project.

Queen City moved for a temporary injunction to prevent the imposition of the PLA bid specification. The district court heard argument and denied the motion from the bench, later issuing a written ruling.

## ISSUE

Did the district court abuse its discretion in refusing to grant Queen City a temporary injunction preventing Rochester from requiring successful bidders on the civic center project to sign the PLA?

## ANALYSIS

■ Absent a clear abuse of discretion, we will not reverse the district court's decision whether to grant a temporary injunction. *Carl Bolander & Sons Co. v. City of Minneapolis*, 502 N.W.2d 203, 209 (Minn.1993). We view the facts alleged in the pleadings and affidavits in the light most favorable to the prevailing party. *Pacific Equip. & Irrigation v. Toro Co.*, 519 N.W.2d 911, 914 (Minn.App.1994), *review denied* (Minn. Sept. 16, 1994).

■ A temporary injunction is an "extraordinary equitable remedy" that serves to maintain "the status quo pending a trial on the merits." *Ecolab, Inc. v. Gartland*, 537 N.W.2d 291, 294 (Minn.App.1995). To be entitled to an injunction, Queen City must show that it faces irreparable harm and has no adequate remedy at law. *Cherne Indus. v. Grounds & Assoc.*, 278 N.W.2d 81, 92 (Minn.1979). It alleges that the PLA bid specification in essence makes it impossible for it to submit a successful bid on the civic center project. Once the contract is let, even if Queen City successfully challenges the contract, its remedies are limited to recovery of the amount it spent in preparing its bid. Minn.Stat. § 471.345, subd. 14 (1998). As Queen City points out, those costs are relatively small, and pale in comparison to the profit a successful bidder might hope to earn on the project. Assuming for argument's sake that the PLA requirement does prevent Queen City from effectively competing for a contract on the civic center project, once the project is bid out with the PLA requirement in place, Queen City's opportunity to earn any profit on the project is gone forever. As a result, Queen City at least arguably faces irreparable harm without adequate legal remedy.

■ But in order to merit injunctive relief, Queen City must also demonstrate its entitlement under the five factors set forth in *Dahlberg Bros. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965):(1) the relationship between the parties; (2) the relative hardship; (3) the likelihood of success; (4) the public interest; and (5) any administrative burdens.

■ The first Dahlberg factor, preserving the "status quo ante" relationship of the parties, *Dahlberg*, 272 Minn. at 276, 137 N.W.2d at 322, echoes the above discussion of irreparable harm and adequacy of legal remedy. If the civic center project is allowed to be bid out with the PLA requirement (again assuming for argument's sake Queen City's version of the effect on it), Queen City would lose forever the chance to win a profitable contract on the project. This factor weighs in Queen City's favor.

The second Dahlberg factor requires weighing the relative hardship to the parties if their positions on injunctive relief do not prevail. Queen City argues that *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367 (8th Cir.1991), supports its argument that the loss of the meaningful opportunity to bid on the contract is sufficient hardship to justify an injunction. In *Glenwood Bridge*, the city of Minneapolis had received and opened bids on a bridge project when its director of public works recommended that the bids be rejected and the project rebid with the inclusion of a PLA. Glenwood Bridge, Inc., the low bidder, objected to this, informing the city that its collective bargaining agreement already included a no-strike/no-lockout clause. The city decided that that clause was not good enough, however, rejected all the bids, and readvertised the project. Glenwood Bridge, Inc. sued for injunctive relief. The district court denied the injunction, but the Eighth Circuit eventually issued it. *Id.* at 367–69.

The court based its decision in primary part on its reading of federal labor law that it said made

the petitioner-employer * * * the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process

and * * * gives it rights enforceable against governmental interference.

*Id.* at 371 (citing *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 109, 110 S.Ct. 444, 450, 107 L.Ed.2d 420, 430 (1989)). But two years later the Supreme Court made clear that the federal laws *Glenwood Bridge* relied on in granting the injunction did not apply in this situation. In *Building & Constr. Trades Council v. Associated Builders & Contractors [Boston Harbor]*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), the Supreme Court explained that the federal law *Glenwood Bridge* relied on prevented a state or local government from regulating in the area of collective bargaining, but not from acting as a purchaser in the area. When it imposes a PLA bid specification on a public works project, the Supreme Court held, a government is acting not in its capacity as a regulator, but in its capacity as a purchaser. As a result, such bid specifications are not prohibited or preempted by federal law. *Id.* at 226–233, 113 S.Ct. at 1196–99, 122 L.Ed.2d at 575–579. Because *Boston Harbor* squarely rejected the underlying federal law premises of *Glenwood Bridge*, the latter case is no longer persuasive precedent.

Queen City also presented evidence that the PLA bid specification will raise its bid costs to the point where it would be impossible for Queen City to win the contract. But Queen City has presented no evidence to demonstrate that without the PLA requirement it *would* be the low bidder on the project, nor of course could it so demonstrate before the bids were opened. In fact, Queen City itself estimates that it has been the low bidder on only one-eighth of the public construction projects on which it has bid. The harm to Queen City from the imposition of the PLA bid specification is thus speculative, because even in the absence of the PLA requirement Queen City can do no more than speculate that it might have been the low bidder on the project. As a federal court observed in

response to a similar contention, the plaintiff's

allegations of harm are speculative at this point. [The plaintiff] could be harmed if it submitted the lowest responsible bid, if its bid were rejected, and if the rejection of the bid were ultimately determined to be unlawful.

*Minnesota Chapter of Assoc. Builders & Contractors v. County of St. Louis*, 825 F.Supp. 238, 242 (D.Minn.1993).

By contrast, Rochester has offered evidence demonstrating that if the project is delayed by even two months it will incur at least $111,000 in additional construction costs. In addition, the record reveals that the civic center is already rented for the early months of 2001, so if the project is not completed by December 2000, Rochester will lose revenue from the reservations it will not be able to honor. In these circumstances, the balance of hardships weighs against granting the injunction.

The third Dahlberg factor requires an analysis of Queen City's likelihood of success on the merits. To succeed, Queen City must show that the PLA requirement violates Minnesota's competitive bidding laws.

■ As a charter city, Rochester must comply with its home rule charter and the state Uniform Municipal Contracting Law, both of which require that the civic center contract be put out for competitive bids. Minn.Stat. § 471.345, subd. 4 (1998); Rochester Home Rule Charter, Ch. XII, § 12.00. But the Uniform Municipal Contracting Law contains no provisions governing the manner by which contracts are to be let; instead, the statute only determines which contracts are subject to competitive bidding requirements. Thus, the rules governing Rochester's competitive bidding requirements are found in its home rule charter and Minnesota case law.

Rochester's home rule charter provision concerning bid specifications, Rochester Home Rule Charter, Ch. XII, § 12.02, does not provide any substantive guidance.

Our supreme court, however, has required "that the plans and specifications be so framed as to permit free and open bidding by all interested parties," *Coller v. City of St. Paul*, 223 Minn. 376, 384–85, 26 N.W.2d 835, 840 (1947), and that "the specifications must be so drawn as to give all bidders an equal opportunity without granting an advantage to one or placing others at a disadvantage." *Foley Bros. v. Marshall*, 266 Minn. 259, 264, 123 N.W.2d 387, 391 (1963).

■ The home rule charter also requires Rochester to award the contract to the "lowest reliable and responsible bidder complying with the foregoing requirements, provided, that the common council or board may reject any bids which it may deem unreasonable or unreliable." Rochester Home Rule Charter, Ch. XII, § 12.06. In determining the "lowest reliable and responsible bidder," a city may consider factors other than price. "Value is not always determined by price alone." *Otter Tail Power Co. v. Village of Elbow Lake*, 234 Minn. 419, 425, 49 N.W.2d 197, 201 (1951).

■ Our competitive bidding laws recognize "the necessity for according public officials some latitude in purchasing items on which bids are required." *Leskinen v. Pucelj*, 262 Minn. 461, 469, 115 N.W.2d 346, 352 (1962). In light of that latitude, we do not lightly interfere with a city's decisions in granting a contract:

> The awarding of a contract is an administrative act of discretion vested by law in the governing authorities of the city. * * * [T]he courts cannot direct the authorities as to how they shall exercise that discretionary power, nor direct to whom they must let a contract. They may only enjoin them from doing so illegally, which must include an arbitrary, capricious, or unreasonable exercise of power.

*Nielsen v. City of St. Paul*, 252 Minn. 12, 18, 88 N.W.2d 853, 858 (1958).

■ But Queen City argues that this rule does not apply where a public entity seeks to impose a bid restriction; in that case, Queen City argues, Minnesota law "place[s] the burden on the government to justify any departures from fully open and competitive contract awards." But Queen City provides no specific citation to support this contention, nor does it appear that it could. Nothing in the requirements "that the plans and specifications be so framed as to permit free and open bidding by all interested parties," *Coller*, 223 Minn. at 384–85, 26 N.W.2d at 840, or that "the specifications must be so drawn as to give all bidders an equal opportunity without granting an advantage to one or placing others at a disadvantage," *Foley Bros.*, 266 Minn. at 264, 123 N.W.2d at 391, changes the rule that

> the courts * * * have power to review administrative acts to determine whether they are arbitrary, unreasonable, capricious, or based on an erroneous view of the law.

*Id.* at 266, 123 N.W.2d at 392. The decision how to design bid specifications that meet the requirements of *Coller* and *Foley Bros.* is thus within Rochester's discretion, and we will only overturn its decision if the method Rochester selects is arbitrary, capricious, or unreasonable.

■ Whether our competitive bidding laws permit a public entity to impose a bid specification requiring all successful bidders to sign a PLA is a question of first impression for Minnesota appellate courts. But although there is no binding authority on point, there is persuasive authority. In *Minnesota Chapter of Assoc. Builders & Contractors*, the federal district court refused to grant an injunction preventing the imposition of a PLA bid specification. The court concluded, among other things, that the plaintiff had not demonstrated a likelihood of success on its argument that the PLA bid specification violated Minnesota's competitive bidding laws, explaining as follows:

> [t]he county has an interest in avoiding delays resulting from labor difficulties, and the Project Labor Agreement is a

rational way to address this interest. Furthermore, there is no evidence before the court that the project would cost less without the requirement that contractors sign the Project Labor Agreement. Contractors presumably would have to pay the prevailing wage with or without the labor agreement, so the cost to the state might not prove to be more as a result [of] the Project Labor Agreement. It might be that the avoidance of delays guaranteed by the Project Labor Agreement would ultimately save [the] county money.

825 F.Supp. at 244. The Minnesota Attorney General has also issued an opinion that the use of a PLA bid specification in a public project does not necessarily violate Minnesota law. Op. Att'y Gen. 707a at 21–22 (July 27, 1993).

Although no Minnesota appellate court has addressed this issue, many appellate courts from other states have. Most of those courts have approved the use of PLA bid restrictions, and no published decision anywhere has held that a PLA bid restriction is a per se violation of state competitive bidding laws. As the California Supreme Court observed in holding that the use of a PLA requirement was not anticompetitive:

> Judicial decisions in other jurisdictions are largely in accord with this conclusion, and those few that invalidate project labor agreements either do so under competitive bidding laws that, unlike those applicable to this case, emphasize "unfettered competition" over more generalized public interest considerations, or employ a less deferential standard of review * * * than obtains in this state.

*Associated Builders & Contractors, Inc. v. San Francisco Airports Comm'n*, 21 Cal.4th 352, 369, 981 P.2d 499, 509, 87 Cal.Rptr.2d 654, 665 (1999); *accord Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir.1996) (upholding use of PLA requirement); *Laborers Local No. 942 v. Lampkin*, 956 P.2d 422, 436 (Alaska 1998) (same); *John T.*

*Callahan & Sons v. City of Malden*, 430 Mass. 124, 132–33, 713 N.E.2d 955, 961 (1999) (same); *Associated Builders & Contractors v. Southern Nev. Water Auth.*, 979 P.2d 224, 229 (Nev.1999) (same); *State ex rel. Assoc. Builders & Contractors v. Jefferson County Bd. of Comm'rs*, 106 Ohio App.3d 176, 181, 665 N.E.2d 723, 727 (1995) (same).

Some courts have held that PLA requirements were not justified under certain circumstances. For example, in *In re New York State Chapter, Assoc. Gen. Contractors v. New York State Thruway Auth.*, 88 N.Y.2d 56, 643 N.Y.S.2d 480, 666 N.E.2d 185 (1996), the New York Court of Appeals held that a PLA requirement on a construction project for improvements to a cancer institute did violate competitive bidding laws because the responsible agency failed to show any "cost savings * * * or any unique feature of the project which necessitated a PLA." *Id.* at 74, 643 N.Y.S.2d 480, 666 N.E.2d at 193. At the same time, however, the court concluded that a PLA requirement on a bridge renovation project did not violate competitive bidding laws because it was directly tied to competitive bidding goals. *Id.* at 71, 643 N.Y.S.2d 480, 666 N.E.2d at 191.

The most restrictive approach is that adopted by the New Jersey Supreme Court. In *George Harms Constr. Co. v. New Jersey Turnpike Auth.*, 137 N.J. 8, 644 A.2d 76 (1994), the court concluded that the project labor agreement at issue in that case was inconsistent with New Jersey's "paramount policy" fostering "unfettered competition" in public contracts. *Id.* at 44, 644 A.2d at 95. Subsequently, in *Tormee Constr., Inc. v. Mercer County Improve. Auth.* 143 N.J. 143, 669 A.2d 1369 (1995), even though the court made it clear that project labor agreements are not per se illegal under New Jersey law, it appeared to conclude that such agreements may be required only in "exceptional circumstances." *Id.* at 149, 669 A.2d at 1372.

■ Queen City contends that because the New Jersey competitive bidding laws emphasize "unfettered competition," which it says is analogous to Minnesota's insistence on "full," "free," and "unrestricted" competition, we should adopt the New Jersey approach. But Queen City overlooks the New Jersey court's declaration that "unfettered competition" is the "paramount policy" underlying that state's competitive bidding laws. *George Harms Constr. Co.*, 137 N.J. at 44, 644 A.2d at 95. In Minnesota, fostering competition is only one of the purposes of competitive bidding laws, which are designed "to promote honesty, economy and aboveboard dealing" and guard against "fraud, favoritism, extravagance, and improvidence." *Coller*, 223 Minn. at 387–88, 26 N.W.2d at 841. Other courts, with competitive bidding policies more like Minnesota's, have refused to follow *George Harms Constr. Co.* for this reason. *Laborers Local No. 942*, 956 P.2d at 434 ("this policy does not require the 'unfettered competition' that the *George Harms* court found required by the procurement code at issue there."); *San Francisco Airports Comm'n*, 21 Cal.4th at 372, 981 P.2d at 511, 87 Cal. Rptr.2d at 667 ("ABC directs us to no authority supporting the existence of a policy of 'unfettered competition' underlying the competitive bidding law of California."); *New York State Thruway Auth.*, 88 N.Y.2d at 67, 643 N.Y.S.2d 480, 666 N.E.2d at 189 ("Because we have never construed New York's competitive bidding statutes to be so absolute, we answer the question differently."). Because, as in these other states, Minnesota's competitive bidding laws do not enshrine "unfettered competition" as their "paramount policy," we concur with these courts and refuse to follow New Jersey's example.

■ Queen City argues that the PLA bid specification is illegal because its result is "not 'full and free competition,' but a competition limited to union contractors who are accustomed to union contract terms." The record, however, refutes that

contention. The record contains evidence that a non-union contractor can in fact win a contract on a project for which a PLA is in place: for example, a non-union company, Penn Co Construction Company, bid on and won a contract to perform work at the Minneapolis–St. Paul International Airport at a time when a PLA was in effect. *See also Southern Nev. Water Auth.*, 979 P.2d at 229, n. 1 (statistics showing higher percentage of non-union contractors won contracts on PLA projects than on non-PLA projects). On this record, therefore, the most that can be said is that some non-union contractors believe that the PLA makes submitting a bid economically infeasible for them. But, as our supreme court has observed, "[t]he fact that they [can] not meet a competitive price does not make the specifications too restrictive to permit competitive bidding." *Otter Tail*, 234 Minn. at 425, 49 N.W.2d at 202; *see also New York State Thruway Auth.*, 88 N.Y.2d at 71, 643 N.Y.S.2d 480, 666 N.E.2d at 191 ("The fact that certain nonunion contractors may be disinclined to submit bids does not amount to the preclusion of competition we identified * *.* as violative of the competitive bidding mandate."); *San Francisco Airports Comm'n*, 21 Cal.4th at 369, 981 P.2d at 509, 87 Cal.Rptr.2d at 665 ("ABC members' election not to bid on the airport project, out of a desire to avoid dealing with unions or for whatever reasons, does not make the P[L]A anticompetitive.") The fact that some non-union contractors can win contracts on projects where a PLA is in place suggests that the PLA bid specification is not arbitrary, capricious or unreasonable.

Queen City also argues that the PLA bid specification violates the competitive bidding laws because Rochester's decision to impose it was motivated by improper reasons. As Queen City notes, the council's original February 17, 1999 resolution approving the imposition of a PLA bid specification provided no reasons for the action. The Common Council corrected that omission on April 5, 1999. But 12 days earlier, on March 24, 1999, Queen

City had sued Rochester to prevent the imposition of the PLA requirement. From the timing of the second resolution, Queen City infers that it was nothing more than a "post hoc rationalization" that the district court committed clear error by relying on. Queen City supports this inference with three affidavits in which the affiants swear that three members of the Common Council, the city attorney, and the city administrator told them that the PLA requirement was adopted as a "payback" for organized labor's help in getting Rochester's one-half-percent sales tax extended, and as a way of ensuring that the AFL–CIO and the Democratic–Farmer–Labor (DFL) Party went forward with planned conventions at the civic center in 2000.

Queen City's attack on the Common Council's motives for imposing the PLA is unpersuasive for at least two reasons. First, Queen City ignores that Ibister wrote the mayor and Common Council on January 14, 1999—more than two months before Queen City's lawsuit—setting forth the reasons why he believed Rochester should require a PLA for the civic center project. That letter was attached to a "Request for Council Action" asking the Common Council to pass a resolution adopting and justifying the PLA at a February 17, 1999 meeting. As a result, the record reflects that the Common Council had before it the arguments justifying the PLA more than a month before Queen City's lawsuit, refuting Queen City's contention that those arguments were "post hoc rationalizations."

■ Second, even if members of the Common Council, the city attorney, and the city administrator made the statements attributed to them by the affiants, such statements would not be evidence of the intent of the Common Council as a whole:

> The reason or motive for passing a resolution might be shown by the discussion had at the board, but certainly not by the secret operation of the mind of individual members.

*Cannon River Mfrs. Ass'n v. Rogers*, 51 Minn. 388, 396, 53 N.W. 759, 761 (1892); *see also Starkweather v. Blair*, 245 Minn. 371, 379–80, 71 N.W.2d 869, 875–76 (1955) ("the motives of the legislative body in enacting any particular legislation are not the proper subject of judicial inquiry"); *cf. In re State Farm Mutual Automobile Insurance Co.*, 392 N.W.2d 558, 569 (Minn. App.1986) ("[Post-session] testimony by individual legislators regarding the legislative intent is inadmissible in construing a statute"). Especially since the procedural posture of this case requires us to view the record in the light most favorable to Rochester, *Pacific Equip. & Irrigation*, 519 N.W.2d at 914, we reject Queen City's attempt to impugn the common council's motives in passing the PLA requirement.

■ Queen City also argues that the PLA requirement violates the competitive bidding laws' purpose of avoiding "extravagance[ ] and improvidence," *Coller*, 223 Minn. at 387, 26 N.W.2d at 841, because it would greatly raise the cost of the civic center project while providing no significant benefits in return. But Queen City provided no evidence that the PLA requirement would raise the cost of the project; instead, it only provided evidence that the PLA requirement would raise the amount of certain contractors' bids. Queen City argues that the inevitable effect of the PLA would be to drive most or all non-union contractors out of the competition, thus allowing the remaining contractors to submit higher bids, but experience in another jurisdiction suggests that that will not necessarily be the case:

> Statistics compiled after the PLA had been adopted indicate that the PLA saved funds and that competition increased. Between the institution of the PLA and March 21, 1997, ninety-three bids had been submitted for sixteen contracts with an average of 5.8 bids per contract. Six of the sixteen contracts were awarded to non-union contractors. Prior to the institution of the PLA, sixty-six bids were received on fifteen con-

tracts for an average of 4.4 bids per contract. Three of the fifteen pre-PLA contracts were awarded to non-union contractors. In addition, the awarded costs of the post-PLA projects [were] twenty-three percent less than anticipated originally and the awarded costs of the pre-PLA projects [were] fourteen percent less than originally anticipated. *Southern Nev. Water Auth.*, 979 P.2d at 229, n. 1.

Furthermore, one of the primary reasons Rochester adopted the PLA was to ensure a reliable supply of skilled labor for the duration of the civic center project. Indeed, Rochester's home rule charter requires it to award the contract to the "lowest *reliable* and responsible bidder." Rochester Home Rule Charter, Chapter XII, Section 12.06 (emphasis added). Minnesota law makes it clear that a public entity may use reliable availability as a factor in determining from which vendor to buy. In *Leskinen*, 262 Minn. at 468–71, 115 N.W.2d at 352–53, plaintiffs challenged the purchase of a snowplow and a snow fence by the town of Balkan. In both cases two bids were received, and in both cases the town purchased the item from the higher of the two bidders. But the supreme court reversed the trial court's decision that the purchases were improper, holding in part that the ready availability of the higher-priced items and the avoidance of possible wartime supply problems justified the higher price. *Id.* at 470, 115 N.W.2d at 353.

Just as in *Leskinen* the town could decide to buy the items from the higher bidder in order to ensure their availability, Rochester can impose a PLA bid specification in order to ensure the availability of skilled labor, even if doing so could possibly increase the amount of the winning bids. Queen City argues vigorously that a PLA is not necessary to ensure the availability of skilled labor, that the risk of any adverse labor action is remote and can be guarded against by other means, but neither Queen City nor this court may substitute its judgment for Rochester's about the preferred way to ensure a reliable supply of skilled labor. *See San Francisco Airports Comm'n*, 21 Cal.4th at 375–76, 981 P.2d at 513, 87 Cal.Rptr.2d at 669–70 (upholding commission's decision to use PLA to ensure reliable supply of labor even without empirical evidence of labor unrest).

An important reason Rochester wanted to ensure the reliable availability of skilled labor for the civic center project was to save public funds. If the project were delayed, Rochester would lose money in two ways: the project would cost more to complete, and the city would lose revenues by being unable to honor reservations already made for the civic center in the months immediately following the scheduled completion date. Other courts have found that such a double-edged sword of delay-imposed cost supported the adoption of a PLA. *San Francisco Airports Comm'n*, 21 Cal.4th at 375, 981 P.2d at 513, 87 Cal.Rptr.2d at 669 ("for every month of delay in completion of the master plan, it was estimated that the cost of administering the project would increase by $1.5 million, and the Commission would lose revenue of $13 million"); *New York State Thruway Auth.*, 88 N.Y.2d at 71, 643 N.Y.S.2d 480, 666 N.E.2d at 191 ("The Thruway Authority's detailed focus on the public fisc—both cost savings and uninterrupted revenues * * * support[s] the determination that this PLA was adopted in conformity with the competitive bidding statutes.").

The decision whether to impose a bid specification on a public contract is left to the discretion of the public entity. Nothing in Minnesota law prevents a public entity, in appropriate circumstances, from imposing a bid specification requiring successful bidders to sign a PLA. Queen City has not carried its heavy burden of demonstrating in these circumstances that Rochester abused its discretion in adopting the PLA requirement. As a result, it has not demonstrated a likelihood of success on the merits. This factor, of course, weighs heavily in Rochester's favor.

The fourth Dahlberg factor requires consideration of public policy. The relevant public policies concerning the collective bargaining laws have already been discussed. As Rochester points out, however, there is another policy at stake here. The decision how to exercise its power to award contracts is entrusted to the city's discretion, and a court should be wary to interfere. *See Nielsen*, 252 Minn. at 18, 88 N.W.2d at 858; *White Bear Docking & Storage, Inc. v. City of White Bear Lake*, 324 N.W.2d 174, 175 (Minn.1982) ("The court's authority to interfere in the management of municipal affairs is, and should be, limited and sparingly invoked."). This factor also weighs in Rochester's favor.

The fifth Dahlberg factor asks about the administrative burden on the court if an injunction is granted. As the district court found, the administrative burden of an injunction in this case would be negligible or nonexistent. While the existence of administrative burden associated with an injunction might be a significant factor counseling against granting the injunction, the absence of such a burden is not a very strong argument in favor of extraordinary relief. This factor weighs in favor of Queen City, but not very heavily.

Queen City simply cannot carry its heavy burden of demonstrating that either Rochester or the district court abused its discretion. With no likelihood of success on the merits, the other Dahlberg factors are almost academic. Queen City is not entitled to enjoin the application of the PLA bid specification.

## DECISION

The district court did not abuse its discretion by refusing to grant Queen City a preliminary injunction preventing Rochester from imposing a PLA requirement on the civic center project.

**Affirmed.**