Smith, J.
(dissenting in Matter of New York State Ch. v New York State Thruway Auth.). Because the Legislature should decide whether New York State’s public authorities may condition awards of public works contracts upon a successful bidder’s adoption of a Project Labor Agreement (PLA), I dissent, in part, and would reverse the order of the Appellate Division in the Thruway Authority case as well as in the Dormitory Authority case.
The Thruway Authority and the Dormitory Authority are public benefit corporations created by the Legislature through the Public Authorities Law (see, Public Authorities Law § 352 [creating the Thruway Authority]; Public Authorities Law § 1677 [creating the Dormitory Authority]). The Thruway Authority exercises jurisdiction over a section of the New York State Thruway which includes the Tappan Zee Bridge (Bridge) (Public Authorities Law § 356 [2]). The Dormitory Authority, the contracting agency for the New York State Department of Health, is authorized by statute to act as the contracting agency for the Roswell Park Cancer Institute (Roswell Park) because the institute falls under the Department of Health (Public Authorities Law § 1680 [1], [2] [a]; Public Health Law § 2420).
In a memorandum dated August 17, 1993, the Governor’s office asked all State construction agencies and authorities to consider the benefits of using prehire or project labor agreements, which "typically require all contractors and subcontractors on a [construction] project to use a designated source for all construction workforce hiring, typically union hiring halls.” The memorandum had its genesis in Building & Constr. Trades Council v Associated Bldrs. & Contrs. of Mass./R. I. (507 US 218), the Boston Harbor case, decided by the United States Supreme Court in 1993.
The Governor’s memo, in addition to stating that the Boston Harbor case permitted a State, acting as a consumer in the *78 construction industry marketplace, to require PLAs as a condition of awarding a public works contract, also stated:
"All State agencies, authorities and other entities should consider on a case-by-case basis the possible use of such agreements when acting in the role of a market participant for construction projects. * * * I ask that all State construction agencies and authorities evaluate the benefits, for appropriate projects, of negotiating a pre-hire agreement, either .directly or through a construction manager or general contractor as an agent, with the State or regional Building and Construction Trades Council.”
The Thruway Authority and the Dormitory Authority received copies of the Governor’s memorandum and the document influenced both Authorities to consider using PLAs in pending and anticipated construction projects involving the Bridge and Roswell Park.
In 1994, the Thruway Authority authorized the negotiation of a PLA for the rehabilitation and reconstruction of the Bridge, a project expected to total approximately $130 million (Matter of New York State Ch., Inc., Associated Gen. Contrs. v New York State Thruway Auth., 167 Misc 2d 572). The same year, the Dormitory Authority authorized a PLA for various construction projects involving the renovation and modernization of Roswell Park for the New York State Department of Health. The Roswell Park PLA was projected to cover approximately $170 million worth of construction. PLAs were subsequently negotiated and executed by construction managers for the Thruway Authority and the Dormitory Authority, and successful bidders were required to adopt the applicable PLA’s terms as a condition of being awarded a construction contract for a Bridge or Roswell Park project.
The Bridge Project
Over the years, the Bridge has undergone various repairs. Specifically, during a 24-year period, 23 construction contracts were let by the Thruway Authority. Of the 23 contracts awarded, 20 of the successful bidders were union contractors. The goals for the Bridge PLA, set forth in the preamble to the agreement, seek the timely, efficient and successful completion of Bridge repairs through (1) avoidance of delays through strikes, slowdowns and other disruptions; (2) standardization of the terms and conditions governing work; (3) flexibility in work *79 schedules; (4) negotiated adjustments to work rules and staffing requirements; (5) provisions for the settlement of work disputes, including those related to jurisdiction; (6) a reliable source of skilled and experienced labor; (7) improved opportunities for minorities, women and the economically disadvantaged; (8) minimization of lost toll revenues; and (9) expedition of the construction process and minimization of traffic inconvenience for Bridge users.
The Roswell Park Projects
Roswell Park is a cancer research and treatment center consisting of 18 buildings in a 25-acre area located in downtown Buffalo. As 1 of 27 Comprehensive Cancer Centers designated by the National Cancer Institute, many of the services provided by Roswell Park have long waiting lists. The modernization and renovation effort was spurred by the need to expand existing services, create and deliver new services, and to install a more modern air handling system.
The Dormitory Authority authorized the PLA for the Roswell Park construction projects in order to (1) obtain a reliable source of labor, (2) ensure labor harmony over the course of the projects, and (3) standardize the terms and conditions of work. The need to avoid delays in construction was cited as a primary concern because cancer patients would be at a higher risk of infection by airborne organisms during construction, and because delays would mean fewer cancer patients receive treatment.
The Project Labor Agreements
A detailed review of the PLAs is necessary in order to fully appreciate the preference given unions and thus, the various policy issues raised by the public authorities’ utilization of them. The PLAs in these two cases contain only minor differences and are alike in all material aspects. The Bridge PLA involves some 19 different labor agreements, with each expiring at least once during the period of reconstruction. The Roswell Park PLA involves some 21 agreements involving 15 different unions, with each expiring at least once during the period of the project. Both PLAs institute a mandatory labor referral system:, operated by the signatory unions, which all successful bidders and their subcontractors (collectively referred to as contractors) must use in obtaining a similarly defined class of employees to directly perform construction and construction-related work. The unions must administer the referral system without offending any laws or regulations, and *80 in a nondiscriminatory manner. The PLAs also explicitly prohibit the unions from discriminating against workers in the operation of the referral system on the basis of union or nonunion membership, or any aspect of union membership.
The PLAs require all contractors to hire the vast majority of covered employees through the union referral systems; nonunion contractors may hire some employees and apprentices outside the referral systems, but the PLAs strictly limit their ability to do so both quantitatively and procedurally. Contractors under both PLAs must recognize the signatory unions as the "sole and exclusive” bargaining representatives for the employees covered by the agreements. The contractors must also make contributions to certain employee benefit funds established and maintained by the unions. Nonunion affiliated workers hired under the PLAs must make payments to the signatory unions which union members already pay as union dues. These payments are intended to reimburse the unions for acting as the workers’ bargaining agents, an assignment mandated by the PLAs since contractors may not recognize any other bargaining representative for the covered employees.[1] While the Bridge PLA permits employees to merely pay an agency shop fee, the Roswell Park PLA requires all employees to become union members, though they may limit their membership to "financial core membership.”
Both PLAs also provide that the unions will not strike, picket, conduct work stoppages, or otherwise engage in "disruptive” activity for "any reason.” Failure of workers employed under the PLAs to cross a picket line by a signatory or nonsignatory union constitutes a violation of the applicable PLA. Contractors may not lock out any employees hired pursuant to the PLAs.
The Applicable Competitive Bidding Statutes
Unlike actors and projects in private sector construction, the Authorities and public works projects here are subject to competitive bidding statutes. The Thruway Authority is governed by Public Authorities Law § 359, which requires that contracts for construction, reconstruction and maintenance of the New York State Thruway, of which the Bridge is a part:
*81 "be let to the lowest responsible bidder, by sealed proposals publicly opened, after public advertisement and upon such terms and conditions as the authority shall require” ( 359 [1]).
Because Roswell Park falls under the jurisdiction of the Department of Health, all contracts for the construction, alteration, repair or improvement of Roswell Park facilities must comply with Public Buildings Law § 8 (State Finance Law §§ 125, 127). Section 8 (6) of the Public Buildings Law requires that:
"All contracts for amounts in excess of five thousand dollars for the work of construction, reconstruction, alteration, repair or improvement of any state building, whether constructed or to be constructed must be offered for public bidding and may be awarded to the lowest responsible and reliable bidder, as will best promote the public interest.”
Furthermore, in 1989, the Legislature amended section 1680 (2) (a) of the Public Authorities Law to provide that:
"[A]ny contract undertaken or financed by the dormitory authority for any construction, reconstruction, rehabilitation or improvement of any building commenced after January first, nineteen hundred eighty-nine for the department of health shall comply with the provisions of section one hundred thirty-five of the state finance law.”
Section 135 of the State Finance Law also requires that construction contracts for specified work be awarded:
"separately to responsible and reliable persons, firms or corporations engaged in these classes of work. A contract for one or more buildings in any project shall be awarded to the lowest responsible bidder for all the buildings included in the specifications.”
These various competitive bidding statutes have, as noted by the majority, two common purposes:
"(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts.” (Majority opn, at 68.)
*82 A low bid may be rejected for a good reason, but the "power to reject any or all bids may not be exercised arbitrarily or for the purpose of thwarting the public benefit intended to be served by the competitive process” (Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 149). Thus, the directive to promote the public interest may not be viewed in isolation, without regard to the full range of fiscal implications, as well as the anticompetitive effects which may result. The question, as we view it, is whether the competitive bidding statutes authorize public authorities to use PLAs to limit the pool of those who will be considered "responsible bidders.”
Separation of Powers, PLA Favoritism, and Policy Choices
The decision to favor union over nonunion contractors reflects a policy decision which should have been reserved to the Legislature.
"Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. * * * An agency cannot by its regulations effect its vision of societal policy choices [citations omitted] and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer” (Matter of Campagna v Shaffer, 73 NY2d 237, 242-243).
"Private employers in this State are free to make employment decisions on whatever basis they choose, as long as the basis is not prohibited by law” (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 359). Here, we have public authorities which are statutorily obligated to let contracts to the lowest bidder. But by their very nature, the PLAs may interfere with that obligation because they may cause the "lowest” bids to be inflated by the costs of organized labor, and because the most "responsible” bidder may be one who does not utilize organized labor. The conclusion that particular labor practices best advance certain objective goals is a policy determination best left to the Legislature (see, Boreali v Axelrod, 71 NY2d 1 [striking a balance between competing interests, various businesses, and the general public on the basis of political, social and. economic, rather than technical factors is more appropriately made by the Legislature instead of the Public Health Council]).
Indeed, the determination that prehire or Project Labor Agreements are permissible as a matter of Federal law was *83 reached by Congress, a legislative body, and not by the executive branch of the Federal Government (see, 29 USC § 158 [e], [f]). The Boston Harbor case, which provides the background for these appeals, involved the judicial interpretation of a Federal statute which expressly authorized PLAs, and contained no State law issues. In contrast, the New York State Legislature has not provided a broad grant of authorization for PLAs analogous to congressional amendment of the National Labor Relations Act, and the policies of competitive bidding statutes in promoting competition and discouraging favoritism in the competitive bidding process are at odds with the effect of PLAs. Whether PLAs may be required by the State as a purchaser of construction services absent specific legislative authorization requires the balancing of competing policy interests best left to the legislative branch of government.[2]
Moreover, the majority’s reliance on Northern Ohio Ch. of Associated Bldrs. & Contrs. v Gateway Economic Dev. Corp. (1992 WL 119375 [ND Ohio, May 12, 1992]) and Utility Contrs. Assn. v Department of Pub. Works (29 Mass App Ct 726, 565 NE2d 459 [1991]) as evidence that other courts have recognized the "efficiencies to be gained” through the use of PLAs (see, majority opn, at 65) is misplaced. In Northern Ohio Ch., plaintiff sought an injunction against the PLA requirement imposed by the Gateway Economic Development Corporation of Greater Cleveland on four Federal law grounds and two State law grounds (violation of Ohio’s Public Bidding Statute and violations of the Ohio State Constitution). The District Court dismissed the Federal claims on the ground that Gateway was not a State actor, and declined to retain jurisdiction over the pending State law claims. The court did not address the benefits or efficiencies to be gained from using PLAs. The court in Utility Contrs. dismissed the case as moot because the Department of Public Works stated that it did not intend to issue the contested bid specification which required contractors to execute a PLA as a condition of accepting bids. The majority contends that the separation of powers doctrine is not implicated in these appeals because competitive bidding statutes provide sufficient guidance for agency action (majority opn, at 76). However, we have repeatedly held that absent a specific grant of legislative authority, a governmental *84 body may not use its contracting power to implement an extrinsic social policy by requiring the adoption of specified labor practices (see, Matter of Broidrick v Lindsay, 39 NY2d 641 [Mayor not authorized to require certain minority percentages of employment by construction contractors in enforcing nondiscrimination statutes]; Matter of Fullilove v Beame, 48 NY2d 376 [New York City may not implement the goal of nondiscrimination by requiring contractors to adopt an affirmative action program as a condition of contracting with the city]; Subcontractors Trade Assn. v Koch, 62 NY2d 422 [Mayor may not require that 10% of all construction contracts awarded by the city be given to locally based enterprises in order to promote the development of businesses and opportunities in economically depressed areas]; Under 21, 65 NY2d 344, supra [Mayor may not enforce laws prohibiting employment discrimination by prohibiting those who secure contracts with the city from refusing to hire people on the basis of sexual orientation or affectional preference]). As in the foregoing cases, the competitive bidding statutes provide the general directive to award contracts to the lowest responsible bidder, but do not authorize the particular remedy which the Authorities seek to implement here. Indeed, by balancing the competing interests in this case, without statutory authorization, the majority engages in the kind of policy making properly reserved to the Legislature.
We recognize that unlike the New Jersey competitive bidding statute at issue in Harms Constr. Co. v New Jersey Turnpike Auth. (137 NJ 8, 644 A2d 76), New York State’s competitive bidding statutes do not promote "unfettered competition”, and we do not urge that interpretation of our statutes here. Moreover, the fuller description of New Jersey’s competitive bidding statutes provided by the New Jersey Supreme Court in Tormee Constr. v Mercer County Improvement Auth. (143 NJ 143, 669 A2d 1369), indicates that, similar to New York law, New Jersey requires all contracts requiring public advertisement for bids be awarded to the "lowest responsible bidder” (see also, NJ Stat Annot § 40A: 11-6.1).
The New Jersey Supreme Court also invalidated the PLA in Tormee because no "exceptional circumstances,” which the court believed had been demonstrated in the Thruway Authority case, justified the PLA’s anticompetitive effects. However, even in reaching this holding, the Tormee court stated:
"[W]e recognize that the Legislature is better suited *85 than the judiciary to determine 'the size, complexity and cost’ of projects that justify recourse to a PLA. New York Thruway, supra, 620 N.Y.S.2d at 856, 207 AD2d 26. We also believe that the Legislature is better suited to accommodate the several interests of labor, management, and the public. Harms, supra, 137 N.J. at 45” (143 NJ, at 150-151, 669 A2d, at 1373, supra).
It is important to note that the PLAs were negotiated without the input of any spokesperson for nonunion contractors or nonunion labor. The terms of the Bridge PLA were reached after approximately four months of negotiations between the Thruway Authority construction manager and various union representatives. The Roswell Park PLA was negotiated between the Dormitory Authority construction manager, local unions affiliated with the Buffalo Building Trades Council, and four other unions. Apart from the construction managers acting on behalf of the authorities, no representatives of nonunion interests were present at any of the negotiation sessions which resulted in the PLAs at issue here.
The majority freely concedes that "[b]y comprehensively requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers”, the PLAs create anticompetitive effects (majority opn, at 65). Nevertheless, the majority contends that the PLAs do not promote "favoritism or cronyism” because the agreements apply to all contractors, both union and nonunion, and discrimination against employees on the basis of union membership is prohibited.
The Bridge and Roswell Park PLAs decrease competition because they impermissibly favor union contractors over nonunion contractors. Favoritism can take many forms, and the fact that no contractor has been prohibited outright from submitting a bid does not conclusively demonstrate fairness of the bidding process. If the apparently neutral terms of the PLAs skew the competition in favor of union contractors over nonunion contractors, it is immaterial that both groups may become parties to the agreements.
Prior to the PLAs, bidders for Bridge or Roswell Park projects had the ability to compete directly for a pool of labor which included both union and nonunion workers. Contractors could enter into collective bargaining agreements and obtain union *86 affiliated, employees, or, contractors could negotiate directly with workers for their services. In contracting directly with nonunion workers, contractors had the ability to independently negotiate the terms of employee benefit plans and the tasks each worker would be required to perform. Contractors could also choose employees on the basis of their familiarity with a particular management team and the contractor’s business practices, and on the basis of an employee’s prior work history with the contractor.
The PLAs systematically render every advantage to unions and union-affiliated workers. The only successful bidders who lose their ability to staff their work crews in accordance with their prior practice are nonunion contractors. Union contractors, who are already familiar with and use union hiring halls do not suffer any disruptions in their business routines. Moreover, the limited number of workers which contractors may employ outside of the union referral process provides only limited relief from the intrusive impact of the PLAs.[3] Furthermore, since employees hired outside the referral systems must satisfy certain requirements, nonunion contractors also incur additional administrative costs in attempting to retain their employees.[4]
The PLAs also require nonunion contractors to adopt a variety of union practices which place them at a disadvantage with contractors already familiar with jurisdictional rules of various unions and the requirements of local collective bargaining agreements. As the majority notes, the Bridge PLA "incorporates the local collective bargaining agreements of the signatory unions and makes them binding on all successful bidders” (majority opn, at 70); the Roswell Park PLA contains similar provisions. The PLAs also require nonunion contractors to relinquish any savings they may realize from directly negotiating terms of employment with workers since the unions must be recognized as exclusive bargaining agents.
Respondents contend, and the majority accepts, that PLAs protect the public fisc and that a public authority — in support of its decision to utilize a PLA — need point only to an *87 anticipated cost savings and experience with labor unrest, as the Thruway Authority has done. But this ignores the fact that nonunion contractors may be able to submit substantially lower bids if they are not required to comply with a PLA. Moreover, the anticipated savings to the public project are directly attributable to the elimination of the costs of organized labor and labor unrest, or, as the majority notes, "concessions won from local unions” (majority opn, at 70). Viewed another way, organized labor drives the cost of a project up; PLAs bring it back down. Thus, the savings from the PLA are, in essence, artificial and illusory. Viewed in such a light, it cannot be seriously argued that public authorities’ endorsement or utilization of PLAs to appease labor unions is not fundamentally a matter of social policy. As such, it is an issue that should be addressed by the Legislature.
In addition to creating illusory cost savings, the PLAs are in direct contravention of the second purpose of the competitive bidding statutes — to avoid favoritism in the letting of public contracts. True, this is not a situation in which a single bidder has been favored (compare, Gerzof v Sweeney, 16 NY2d 206), and though the favoritism of PLAs may be rationally explained, it is nevertheless manifestly contrary to the second purpose of the competitive bidding statutes. And it is all the more offensive to the competitive bidding statutes because favoritism following from PLAs directly promotes and inflates the artificial cost savings used to support the decision to utilize a PLA in the first instance.
Further, the PLAs turn the concept of competitive bidding upside down. Our jurisprudence reflects that lowest responsible bidders are usually selected by encouraging the most competition to obtain the lowest bid, and then determining whether the lowest bidder is responsible. PLAs, however, operate on the implicit and irrebuttable presumption that a bidder is responsible only if it is a. union contractor. But the requirement that a bidder be responsible cannot be used to decrease competition at the commencement of the bidding process so that the range of bids is artificially restricted and inflated.
Although ensuring labor peace may be a legitimate purpose of entering into a PLA, given proper authorization by the Legislature, we have never held, and the Legislature has never stated that ensuring labor peace is a legitimate purpose of New York State’s competitive bidding statutes. Indeed, our jurisprudence holds that rejection of a low bid from a nonunion contractor solely because of fear that protest by unions would *88 delay construction violates New York’s competitive bidding statutes (see, Matter of M. Cristo, Inc. v State of New York Off. of Gen. Servs., 42 AD2d 481, cited with approval in Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148; Matter of Long Is. Signal Corp. v County of Nassau, 51 Misc 2d 320).
Appeasing unions through favorable treatment in order to ensure labor peace is antithetical to the idea of open and honest competition and does not further the goal of obtaining lowest responsible bidders. Absent statutory authorization, it is irrational to permit the use of PLAs to hold bidders accountable for the conduct of third parties in the guise of seeking "responsible” contractors, since contractors should only be held responsible for their own conduct. Nothing in the history of the competitive bidding statutes suggests that favorable treatment of unions is permissible because of organized labor’s ability to cause labor unrest by protesting a bidder’s lawful labor practices; indeed precedent suggests otherwise.
It is clear from the foregoing that the PLA requirements at issue here cannot be equated with neutral bid specifications such as the use of a particular grade of building materials. Indeed, it is difficult to distinguish this case from Associated Bldrs. & Contrs. v City of Rochester (67 NY2d 854) where an association of nonunion contractors challenged a city ordinance which established a preference for workers who participate in State-approved apprentice programs. Although support for apprenticeship training would arguably have promoted the goal of securing a responsible bidder by ensuring a skilled workforce, we invalidated the preference as being unsupported by the specific goals of competitive bidding statutes.
Public Benefit Corporations
The majority suggests that only public authorities, by virtue of their status as public benefit corporations, may enter into PLAs because they have been granted a measure of flexibility and independence not provided to other agencies. However, the majority’s reliance on Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth. (5 NY2d 420, 422), where we permitted the Thruway Authority to issue specifications for "construction, plumbing, heating and ventilating, electrical and site development work” to be performed in a single contract, instead of the separate contracts called for by State Finance Law § 135, is unwarranted. The interpretation of "lowest responsible bidder” or *89 the standards for determining the lowest responsible bidder were not at issue in that case and we did not hold, or even suggest, that public authorities had greater flexibility than other agencies in awarding contracts.
Moreover, the executive branch has a stated policy of requiring the Thruway Authority and the Dormitory Authority, as contracting agencies for New York State, to employ the same standards as other contracting agencies in determining "responsible and reliable” bidders. Recognizing that "it is the established policy of the State of New York to award certain contracts to the lowest responsible and reliable bidder as will best promote the public interest,” Governor Cuomo issued guidelines, in 1993, to all contracting agencies for determining the responsibility of bidders (9 NYCRR 4.170). The guidelines, promulgated by Executive Order because "the public interest would be served by the uniform application” of competitive bidding standards, apply not only to the public authorities here, but to agencies which are not public benefit corporations such as the Office of General Services (created by Executive Law § 200), the Department of Transportation (created by Transportation Law § 11), the Department of Environmental Conservation (continued in existence by ECL 3-0101), and the Office of Parks, Recreation and Historic Preservation (continued in existence by PRHPL 3.03). Thus, distinguishing between public authorities and other agencies by vesting public benefit corporations with additional discretion to authorize PLAs also creates anomalies in executive branch enforcement policies.
Moreover, recent legislative activity indicates that the Legislature has considered, and acted where action was deemed necessary to permit consideration of employees’ labor affiliation in awarding public works contracts. In 1988, the Legislature created the New York City School Construction Authority. The new legislation permitted the Authority to suspend competitive bidding upon certain conditions, for various construction contracts, notwithstanding the provisions of Public Buildings Law § 8, State Finance Law § 135, General Municipal Law § 103, or of provisions in general, special or local law, charter or administrative code (Public Authorities Law § 1734).[5]
*90 Section 1735 of the Public Authorities Law, also enacted in 1988, and applying only to contracts involving (a) plumbing and gas fitting; (b) steam heating, hot water heating, ventilating and air conditioning apparatus; and (c) electric wiring and standard illuminating fixtures,[6] provides, in relevant part:
"In awarding contracts pursuant to this section the authority shall, in addition to [other factors] * * * consider the following factors when establishing a list of pre-qualified bidders for construction work: (a) the degree to which a contractor or subcontractor utilizes employees who are represented by a labor organization; (b) the absence of any intentional misrepresentation with regard to lists of subcontractors previously submitted * * * and (c) the record of the bidder in complying with existing labor standards, maintaining harmonious labor relations and recognizing state approved apprentice programs” (Public Authorities Law § 1735 [5]).
Section 1735 also creates a committee (composed of two representatives of the Authority, one representative from the Board of Trustees of the Authority, two representatives from construction-related labor organizations and two representatives from the construction industry), to "review and report on the contracts issued pursuant to this section and on the procedures and methodology of the authority in awarding such contracts” (Public Authorities Law § 1735 [4]). Originally scheduled to expire on June 30, 1994, section 1735 was amended in 1994 to extend the date of expiration to June 30, 1999. During the 1993-1994 session, the Legislature also considered requiring the State, as a purchaser of goods and services, to consider whether a contractor had entered into a bona fide collective bargaining agreement with its workers (see, 1993 NY Senate-Assembly Bill S 5902, A 8454).
The factual distinctions drawn by the majority to support its differing results in the Thruway Authority and Dormitory Authority cases are immaterial to the question of whether the PLAs conflict with the purposes of the competitive bidding statutes and whether utilization of PLAs is a matter of social policy best left to the Legislature. Indeed, the ultimate irony of the majority’s project-specific and fact-bound inquiry into whether "the decision to enter into the PLA had as its purpose *91 and likely effect the advancement of the interests embodied in the competitive bidding statutes” is this: any cost savings or timeliness in completing a public works project that is anticipated by the use of a PLA will be offset by the costs and interruptions of the CPLR article 78 litigation that will be commenced to challenge every public project in which a PLA is required as a bid specification. Such a paradox can be avoided by acknowledging the policy implications and myriad factual considerations involved in the use of PLAs in public works, and permitting such decisions to be authorized, informed, and guided by legislative action taken pursuant to that body’s power to make policy choices and enact laws to effectuate them (see, Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 410).
Given the Legislature’s demonstrated interest and involvement in the issues currently before this Court, any judicial or executive determination that the State, acting in its proprietary capacity, may require PLAs, is an unwarranted intrusion on the legislative process. Given the competing political, social and economic policies at stake, and the ability of the Legislature to engage in broad fact-finding hearings to determine the best interests for the State, the issue of whether PLAs may be required in public works projects is properly within the province of the Legislature.
In Matter of New York State Ch. v New York State Thruway: Order affirmed, with costs.
Judges Titone, Bellacosa, Levine and Ciparick concur with Chief Judge Kaye; Judge Smith dissents and votes to reverse in a separate opinion in which Judge Simons concurs.
In Matter of General Bldg. Contrs. v Dormitory Auth.: Order reversed, with costs, and judgment of Supreme Court, Albany County, reinstated.
Judges Titone, Bellacosa, Levine and Ciparick concur with Chief Judge Kaye; Judge Smith concurs in result in a separate opinion in which Judge Simons concurs.

. Because these appeals may be resolved on other grounds, we need not address the argument of the appellants in the Thruway Authority case that the Bridge PLA violates article I, § 17 of the New York Constitution which provides, in part, "Employees shall have the right to organize and to bargain collectively through representatives of their own choosing.”

. Although the majority notes that New York has never prohibited PLAs (majority opn, at 76, n), the central point, that Federal labor policy regarding PLAs has been formulated by Congress, the legislative branch of Government, remains unanswered by the majority.

. The Bridge PLA limits the hiring of employees outside of the referral system to a maximum of 12% per craft. The Roswell Park PLA provides that no more than 10 core employees may be hired for each craft and only in a one to one ratio with union referred workers until the maximum is reached.

. A Bridge contractor must submit a name to a three-person committee charged with the duty of determining whether that person is "qualified.” A Roswell Park contractor may only retain "core” employees.

. However, section 1734 (1) (b) provides that the School Construction Authority is subject to General Municipal Law § 101, which requires separate specifications for certain types of construction work (Public Authorities Law § 1734 [1] [b]).

. Section 1735 also exempts the School Construction Authority from General Municipal Law § 101, which covers the same type of work.